Jack DAVIES, et al. petitioners,
Appellants,

v.

CITY OF MINNEAPOLIS, et
al., Respondents,

and

First Trust Company of St. Paul,
intervenor, Respondent,

Metropolitan Council, intervenor,
Respondent,

Metropolitan Sports Facilities Commission, intervenor, Respondent.

No. 51771.

Supreme Court of Minnesota.

Feb. 19, 1982.

Rehearing Denied April 21, 1982.

Kurzman, Shapiro & Manahan, Minneapolis, Jack Davies, for appellants.

Robert Alfton, City Atty., Jerome R. Jallo, Asst. City Atty., Minneapolis, for City of Minneapolis, et al.

Faegre & Benson, James Fitzmaurice and John H. Hinderaker, Oppenheimer, Wolff, Foster, Shepard & Donnelly, Richard G. Lareau, and Mark P. Wine, Minneapolis, for 1st Trust Co. of St. Paul.

John Hoeft, Staff Counsel, Metro. Council, St. Paul, for Metro. Council.

Olson, Gunn & Seran and David R. Knodell, Minneapolis, for Metro. Sports Facilities Comm.

**TODD, Justice.**

This is an appeal from an order of the District Court of Hennepin County quashing an alternative writ of mandamus directing the City of Minneapolis to submit to Minneapolis voters for their approval a city charter amendment proposed by citizen's petition. If approved by the voters, the effect of the amendment would be to repeal a hotel-motel liquor tax enacted by the City in August of 1979 to finance the construction of a new domed stadium. The trial court upheld the City's refusal to submit the proposed amendment to the electorate, ruling that the amendment was an illegal attempt to supersede a general law, and that if approved, the amendment would unconstitutionally impair the contract rights of a multitude of parties involved in the financing, construction, and leasing of the new stadium, particularly the contract rights of bondholders who have purchased $55,000,000 in revenue bonds to finance the stadium project. While we disagree with the lower court's characterization of the proposed amendment as an illegal attempt to supersede general legislation, we do find the proposed amendment would unconstitutionally impair the contract rights of bondholders, and therefore affirm the decision of the trial court.

Respondent Metropolitan Sports Facilities Commission (Commission) is a public agency created by the Minnesota Legislature in 1977 to evaluate the need for sports facilities in the Twin Cities metropolitan area. Minn.Stat. § 473.553 (1980). The Commission was empowered by law to select the site for and to design, own and operate the domed stadium in question. Respondent Metropolitan Council (Council) is the state agency charged with the responsibility of issuing revenue bonds to finance construction of any sports facility proposed by the Commission.

In 1979, the Commission announced that it had chosen a downtown Minneapolis location as the site for a new stadium. Pursuant to Minnesota Statute section 473.592 (1980), on July 31, 1979, the City of Minneapolis entered into an agreement (hereinafter the Minneapolis Tax Agreement) with the Commission and the Council wherein the City agreed to levy a hotel-motel liquor tax to produce revenue to assist in the debt service on revenue bonds to be issued by the Council. The City's agreement to levy the tax for this purpose was a precondition to the Council's authority to issue bonds for the construction of the stadium facility. Minn.Stat. § 473.581, subd. 3(1) (1980). Minnesota Statute section 473.592, subdivision 1 expressly prohibited the construction of a sports facility in a municipality which had not agreed to levy such a tax:

A sports facility shall not be constructed or remodeled in a municipality which has not entered into an agreement in accordance with this section.

On October 15, 1979, the Council sold $55,000,000 in revenue bonds secured by an Indenture of Trust by and among the Council, the Commission, and respondent First Trust Company of St. Paul, as trustee on behalf of the holders of the Sports Facilities Revenue Bond, Series 1979.

On October 4, 1979, and again on November 1, 1979, petitioners Davies, Speak, Greenfield, and Ogren presented to the Minneapolis City Clerk a petition proposing an amendment to the Minneapolis City Charter. Because the October 4 petition contained over 3,600 signatures which could not be verified, it was rejected. The second petition, however, was certified by the Clerk on November 1, 1979. The proposed charter amendment provided, in pertinent part:

Section ____. [COUNCIL SHALL IMPOSE NO LOCAL TAX FOR BENEFIT OF METROPOLITAN SPORTS FACILITY.] Subdivision 1. The City Council shall levy no tax for the construction or operation of a metropolitan sports facility. Any tax imposed pursuant to an agreement executed as provided in Minnesota laws, 1979, Chapter 203, is repealed as of the effective date of this section.

Subd. 2. On the effective date of this section the agreement with the Metropolitan Council and Metropolitan Sports Facilities Commission entered into by the City pursuant to Laws of Minnesota 1979, Chapter 203, is terminated.

Subd. 3. On the effective date of this section any power of the Metropolitan Sports Facilities Commission and the Metropolitan Council to obligate the City, which power was granted by Laws of Minnesota, 1979, Chapter 203, is terminated.

Subd. 4. The City Council may pay from the general fund any damages resulting from the impairment of the security of any bonds legally issued in reasonable reliance on an agreement terminated by subdivision 2. The City Council shall take whatever reasonable steps are available to mitigate any damages which might arise.

Subd. 5. To mitigate damages as required by subdivision 4, the City Council shall communicate to the Metropolitan Council and the Metropolitan Sports Facilities Commission that the agreement required by paragraph (1), Minnesota Laws 1979, Chapter 203, Section 8 (Minnesota Statutes Section 473.581, subdivision 3, paragraph (1)) has been terminated and that, to protect the security of bond holders, further expenditures of the proceeds of bonds issued pursuant to that agreement shall be terminated. In addition, the City Council shall take all other reasonable action to mitigate damages, including but not limited to seeking relief against any person or agency where there is reason to believe the person or agency may attempt to obligate the City in a manner prohibited by this section.

On December 14, 1979, the Minneapolis City Council adopted a resolution which directed the city clerk *not* to call for an election for the purpose of submitting the proposed charter amendment to Minneapolis voters. The City Council based its action upon an opinion rendered by the City Attorney which concluded the proposed amendment was an unlawful attempt to amend a general law, an unauthorized referendum, and would result in an unconstitutional impairment of contractual rights. On June 30, 1980, Davies and his fellow petitioners commenced this action for a writ of mandamus to compel the Council to place the proposed charter amendment before the voters.

1. The right of a local governmental unit to modify or supersede special legislation by home rule charter amendment is found in article XII, section 2 of the Minnesota Constitution. Section 2 provides, in pertinent part:

> Every law which upon its effective date applies to a single local governmental unit or to a group of such units in a single county or a number of contiguous counties is a special law and shall name the unit or, in the latter case, the counties to which it applies. The legislature may enact special laws relating to local government units, but a special law, unless otherwise provided by general law, shall become effective only after its approval by the affected unit expressed through the voters or the governing body and by such majority as the legislature may direct. Any special law may be modified or superseded by a later home rule charter or amendment applicable to the same local governmental unit * * *.

The problems associated with special legislation were discussed as early as the Minnesota constitutional convention of 1857.[1] One concern is that special interest groups might secure favorable special legislation of which the affected local community simply would not approve.[2] Article XII, section 2 therefore gives to local governmental units the power to escape the effect of special legislation by allowing local approval by the voters or the governing body and subsequent repeal or modification by charter amendment.

---

1. *See* Anderson, *Special Legislation in Minnesota*, 7 Minn.L.Rev. 133 (1923)

2. Note, *Home Rule and Special Legislation in Minnesota*, 47 Minn.L.Rev. 621, 635 (1963).

At issue in the present case is whether the legislation which formulated a scheme for financing a new or remodeled sports facility is special legislation "which upon its effective date" applied "to a single local governmental unit or to a group of such units in a single county * * *." Appellants argue the legislation is clearly a special law which can be modified or superseded by an amendment to the Minneapolis City Charter. The City responds by arguing that the proposed charter amendment is an unlawful attempt to amend a general law.

We conclude the legislation, as amended in 1979, is special legislation within the purview of article XII, section 2. In 1979 the law was amended to require that any new or remodeled sports facility be located in Hennepin County.[3] Minnesota Statute section 473.592, subdivision 1 authorizes any municipality within Hennepin County chosen as a sports facilities site to enter into an agreement with the Commission and the Council, the effect of which is to obligate the municipality to impose a sales tax. Revenue from the tax is to be used to supplement other revenue available to the Commission to pay the debt service on stadium bonds issued by the Council. Minnesota Statute section 473.581, subdivision 4 prohibits the municipality from later impairing, revoking or amending the tax until the bonds are fully discharged. These financing provisions clearly applied their effective date to a group of governmental units in a single county—Hennepin County—and therefore constitute special legislation as defined in article XII, section 2.

We note parenthetically that initial approval of the special legislation by affected local governmental units was not required in the present case. Article XII, section 2 requires such approval *"unless otherwise provided by general law * * *."* (emphasis added) Minnesota Statute section 645.023, subdivision 1 provides in part:

A special law enacted pursuant to the provisions of the Constitution, Article 12, Section 2, shall become effective without the approval of any affected governmental unit or group of such units in a single county or a number of contiguous counties if the law is in any of the following classes:

\*       \*       \*       \*       \*       \*

(a) A law which enables one or more local government units to exercise authority not granted by general law.

Chapter 473 authorizes the imposition of a local sales tax to pay debt service on bonds issued by the Metropolitan Council, a taxing power not granted by general law. There was therefore no requirement that affected local governmental units approve the special law before it became effective.

Respondent First Trust Company of Saint Paul argues that even if the law is considered special legislation, a local charter amendment should never be allowed to override legislation which applies to and confers benefits on more than a single governmental unit. Contrary to this position, we do not view the proposed amendment as an attempt by a single governmental unit to supersede special legislation which applies to several governmental units. While the legislation on its effective date applied to the municipalities within Hennepin County,[4] once the Commission selected the

---

**3.** Minn.Stat. § 473.572, subd. 1 (1980) provides:

Subdivision 1. Notwithstanding any final determination reached by the commission on or before December 1, 1978, pursuant to section 473.571, subdivision 6, the commission shall make a revised determination on a sports facility or sports facilities which facility or facilities (1) may be covered, (2) may include use of the existing or a remodeled metropolitan stadium for baseball, and (3) *shall be located in Hennepin County*. The decision shall be made within 30 days after May 26, 1979. In making its decision the commission may rely on data previously submitted and reviewed pursuant to section 473.571 and need not require new data even if modifications are made in an alternative previously considered. The commission shall give full consideration to the needs of the University of Minnesota when making its revised determination. (emphasis added)

**4.** Minn.Stat. § 645.021, subd. 1 provides:

A special law as defined in the Minnesota Constitution, Article XII, Section 2, shall name the local government unit to which it applies. If a special law applies to a group of

City of Minneapolis as the site for a new domed stadium, the legislation was narrowed in its application to only one municipality. While the location of a new sports facility in Minneapolis undoubtedly inures to the benefit of the surrounding metropolitan area, to preclude a local governmental unit from modifying or superseding special legislation simply because surrounding communities are in some way affected would be to emasculate article XII, section 2.

2. To the extent the proposed amendment would have superseded the stadium legislation by prohibiting further levy of a sales tax on Minneapolis businesses, it was a valid proposed amendment to the Minneapolis City Charter. It does not follow, however, that the City acted unlawfully by refusing to submit the proposed charter amendment to Minneapolis voters. The right of a local governmental unit to modify or supersede special legislation is, of course, subject to the prohibition against impairment of contract found in article I, § 10 of the United States Constitution. Because the proposed charter amendment, if approved by the voters, would unconstitutionally impair the contractual rights of stadium bondholders,[5] we find the Minneapolis City Council properly refused to place the proposed amendment before the electorate.

Pursuant to Minnesota Statute section 473.592, revenue from the sales tax levied by the City is pledged to be used to pay debt service on bonds issued by the Council. Periodic adjustments in the special tax levy, if necessary to meet bond obligations, are required by law. By entering into the Minneapolis Tax Agreement with the Commission and the Council, the City agreed to levy the sales tax until the bond obligations were discharged.[6] According to Section 473.592, subdivision 1, the tax agreement constituted "a contract with and for the security of all bondholders of the bonds and revenue anticipation certificates secured by the tax."

The effect of subdivisions 1 and 2 of the proposed charter amendment would be to terminate the Minneapolis Tax Agreement and to repeal the sales tax imposed by the City. The amendment would therefore work an impairment by totally eliminating an important security provision in the bondholders' contracts.

Of course, the contract clause is not an absolute bar to subsequent modification by a municipality of its own contractual obligations. A law impairing the contractual rights of a party contracting with a municipality "may be constitutional if it is reasonable and necessary to serve an important public purpose." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977). However, appellants do not even suggest that any such purpose exists. Instead, they cling to the proposition that no impairment would result by adoption of the proposed charter amendment for two reasons: 1) the bondholders had notice that a citizens' petition for charter amendment would be filed prior to issuance of the bonds by the Council, and 2) there is no evidence that the value of the bondholders' contracts would be materially diminished. Both these arguments must fail.

An early United States Supreme Court decision dealt with the right of the electorate to impair contract obligations of a state. *Stearns v. Minnesota*, 179 U.S. 223, 21 S.Ct.

local government units in a single county or in a number of contiguous counties, it shall *be sufficient if the law names the county or counties where the affected units are situated.*

5. Article 1, § 10 provides that "[n]o state shall pass any * * * law impairing the obligation of contracts * * *." As a political subdivision of *our state government, the City of Minneapolis* is subject to the impairment clause. *Northern Pac. Ry. Co. v. Duluth*, 208 U.S. 583, 28 S.Ct. 341, 52 L.Ed. 630 (1908).

6. Minn.Stat. § 473.581, subd. 4 (1980) provides in part:

No pledge, mortgage, covenant, or agreement securing bonds may be impaired, revoked, or amended by law or by action of the council, commission, or city, except in accordance with the terms of the resolution or indenture under which the bonds are issued, until the obligations of the council thereunder are fully discharged.

73, 45 L.Ed. 162 (1900). In that case the State of Minnesota had entered into a contract with various railroad companies to impose a gross earnings tax in lieu of a property tax pursuant to statutory authority. The statute was held to be unconstitutional. A constitutional amendment was passed ratifying the contracts, authorizing gross earnings taxes, but reserving to the electorate the right to repeal the exemption. A subsequent referendum left the gross earnings tax in place and removed the exemption from property taxes. The United States Supreme Court held that despite the fact that the Minnesota Constitution expressly reserved for the people the power to repeal any property tax exemption, the state had nevertheless unconstitutionally impaired the contractual rights of the railroad companies. Thus the right of the electorate of Minnesota was subject to the contract clause of the United States Constitution. Similarly, any rights granted to the electorate by article XII section 2 of the Minnesota constitution are subject to the contract provisions of the United States Constitution.

A legislative act does not operate as notice until it goes into effect as law. *Norton v. Kleberg County*, 149 Tex. 261, 231 S.W.2d 716 (1950); *State ex rel. City of Seward v. Marsh*, 104 Neb. 159, 176 N.W. 92 (1920). While the bondholders may have had actual notice of the fact that the appellants' efforts to supersede the special legislation were underway, the mere possibility that a valid petition for charter amendment would be filed cannot be viewed as somehow qualifying or diminishing the contractual rights of the bondholders. If that were the case, a municipality would be able to escape its own contractual obligations with impunity merely by later proposing a city charter amendment to supersede the special legislation which enabled it to act in the first place. We do not ascribe to the framers of article XII, section 2 such a purpose or intent.

Furthermore, we do not find the lack of direct evidence on diminution of value to be fatal to the lower court's finding of contractual impairment. In *United States Trust*

*Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the United States Supreme Court held that the elimination of a bond security provision constituted an impairment of contract. The case involved a pledge made by the states of New York and New Jersey that revenues of certain public transportation facilities would be placed in a reserve fund as security for bonds issued to finance construction of the facilities. When those reserves were later needed to finance additional mass transit for the states, the security provision was repealed. Although the evidence concerning diminution of value was inconclusive, the high court held as a matter of law that the elimination of the security provision impaired the bondholder's contract:

> The fact is that no one can be sure precisely how much financial loss the bondholders suffered. Factors unrelated to repeal may have influenced price. In addition, the market may not have reacted fully, even as yet, to the covenant's repeal, because of the pending litigation and the possibility that the repeal would be nullified by the courts.
>
> In any event, the question of valuation need not be resolved in the instant case because the State has made no effort to compensate the bondholders for any loss sustained by the repeal. As a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion. Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright appeal totally eliminated an important security provision and thus impaired the obligation of the States' contract.

*Id.* at 19, 97 S.Ct. at 1516. As in *United States Trust*, the effect of the proposed city charter amendment would be to totally eliminate an important security provision designed to protect the purchasers of stadium revenue bonds. The City's agreement to levy a sales tax, a security provision for which the bondholders bargained, was a precondition to the Council's authority to issue the bonds. The proposed amendment

does not seek to replace that security with an arguably comparable provision.[7] The amendment, if approved, would quite clearly impair the contractual rights of the bondholders. In *Naftalin v. King*, 252 Minn. 381, 90 N.W.2d 185 (1958), we said:

> Where a contract is entered into in behalf of the state through an act of its legislature, its terms are to be found in the provisions of the act by which it was created. Once the state, pursuant to a legislative act, has exercised its power and entered upon a contract, as it does when it issues either bonds or certificates of indebtedness under a statute providing for tax levies to be paid into a special fund for their repayment, the state, under the contract clauses of the state and the Federal constitutions, cannot impair that contract but is bound to carry out its terms without repealing, postponing, diminishing, or otherwise impairing the tax levies so established for its fulfillment.

*Id.* at 389, 90 N.W.2d at 191.

Having determined that the proposed charter amendment was manifestly an unconstitutional impairment of the bondholders' contracts, we conclude that the trial court was correct in sustaining the refusal by the City Council to call an election. When a proposed charter amendment appears to be manifestly unconstitutional, the City Council must have the authority to avoid what would amount to a futile election and a total waste of taxpayers' money. *HRA v. City of Minneapolis*, 293 Minn. 227, 198 N.W.2d 531 (1972).

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

YETKA, Justice (dissenting).

Although I concur with the majority's analysis that Minn.Stat. § 473.592 (1980) is special legislation, I disagree with the conclusion that the proposed Charter Amendment, had it been adopted, would have violated the contract clause of the United States Constitution. Accordingly, I do not believe that the Minneapolis City Council was justified in refusing to submit the proposed Charter Amendment to the electorate for approval.

1. Art. 12, § 2 of the Minnesota Constitution and the provisions of Minn.Stat. §§ 645.021–.024 (1980) relating to special legislation were implied conditions in the contracts with the bondholders. As the Supreme Court stated in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19–20, n.17, 97 S.Ct. at 1516, n.17 (1977) (citations omitted):

> The obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement. * * * This principle presumes that the contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached.

*See also, Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

The majority's argument that a legislative act does not operate as notice until it goes into effect misconstrues the issue involved here.[1] In this regard, the fact that appellants attempted to supersede the spe-

---

7. Subdivision 4 of the proposed charter amendment provides that the City Council "*may* pay from the general fund any damages resulting from the impairment of the security of any bonds * * *." (emphasis added) This vague authorization to pay "damages" certainly cannot be characterized as a comparable security provision for payment of debt service on the bonds. The proposed amendment does not *require* the City to pay damages to anyone. In fact, subdivision 2 states that an agreement between the Metropolitan Council, the Sports Facilities Commission and the City "is termi-

nated." Subdivision 2 is a disclaimer of any further contractual liability.

1. Under Minn.Stat. § 645.02 (1980), special laws required to be approved by a local unit are effective upon filing of the certificate of approval. Special laws enacted under Minn.Stat. § 645.023(a) (1980) allowing a local government to exercise authority not granted by general law become effective without the approval of the affected local government unit. The majority indicates in dicta that the tax imposed under Minn.Stat. § 473.592 (1980) provides a

cial legislation with the proposed Charter Amendment is neither legally significant nor the factor which placed the respondents on notice, although respondents were well aware of the situation. Rather, respondents had notice generally that the city had the right to modify or supersede the special legislation pursuant to Minn.Const. art. 12, § 2. The instant case is, thus, distinguishable from notice of legislation not yet passed. Nor is this the case of legislation which is adopted and subsequently repealed.[2] The expectation here is that the special legislation—as part of the general process of adoption—is subject to later modification. Thus, Minn.Const. art. 12, § 2, was an implied condition of the contract. To hold otherwise would be to allow the legislature, in clear violation of Minn.Const. art. 12, § 2, to enact special legislation of a type the local unit affected would be prevented from later modifying or repealing.[3]

2. I also would hold that the proposed Charter Amendment would not impair the obligation of the city towards the bondholders in violation of the contract clause. It is a principle of long standing that not all legislation that repeals or modifies a contract is an impairment in violation of the contract clause. *See W. B. Worthen Co. v.*

*Kavanaugh,* 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1935), *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). The scrutiny accorded modification of contracts between a state and a private party has been increased under *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The modifications contained in the proposed Charter Amendment, however, satisfy the requirements and concerns expressed in *United States Trust.*

In *United States Trust,* the Court struck down as an unconstitutional impairment of contract the repeal of a security provision contained in the contract between bondholders and the Port Authority of New York and New Jersey. The security provision pledged that the revenues from the Port Authority facilities would be held in reserve in the event that the Port Authority found itself unable to meet its bond obligations. In finding that the repeal constituted an "impairment" of contract, the Court explained:

[T]he State has made no effort to compensate the bondholders for any loss sustained by the repeal. As a security provision, the covenant was not superfluous

---

power not granted under general law and thus is covered by § 645.023(a). Notice, however, is not concerned with the effective date of legislation but with the power of a city to modify special legislation at a later date.

**2.** The argument that the instant situation is analogous to an "implied" expectation that regular legislation may always be later repealed also must fail. In that situation, the legislature is—and can—bind itself. Here, however, special legislation affects a particular local government unit. For that reason, a double tiered system of adoption is used, involving approval or subsequent disapproval by the affected unit. As noted by the majority, the legislature could otherwise pass legislation which the affected local government unit would not approve. *See,* Note, *Home Rule and Special Legislation in Minnesota,* 47 Minn.L.Rev. 621, 635 (1963).

**3.** The instant case is distinguishable from *Stearns v. Minnesota,* 179 U.S. 223, 21 S.Ct. 73, 45 L.Ed. 162 (1900). In that case, art. 4, § 32a of the Minnesota Constitution of 1907 provided that no laws respecting any change of taxation of railroads could be repealed save by popular vote. By referendum, the state repealed a stat-

ute in part, requiring railroads to pay a three percent tax, but ending a tax exemption previously granted by contract. The Court held that the action impaired a contractual obligation in violation of the contract clause. The Court proscribed the ability of the state to totally impair the obligation of contract—forcing the appellant railroad to continue to perform—under the reserved power to amend, and at the same time, reducing the state's obligation under the contract. As will be discussed below, however, the Davies provision does not impair the obligation of the contract. Moreover, *Stearns* also concerned an action by the state in total disregard of the railroad's contractual rights. Significantly, the Court noted that section 32a granted the state the reserved power to amend rates, not to end or otherwise modify the railroad's exemption without corresponding consideration. While I would hold that the contract in the instant case incorporated art. 12, § 2 of the Minnesota Constitution, the power to modify or amend does not give the affected local unit the power to seriously impair or violate the property rights of contracting parties.

\* \* \*. Nor was the covenant *merely modified or replaced by an arguably comparable. security provision. Its outright repeal totally eliminated an important security provision,* and thus impaired the obligation of the State's contract.

*Id.* at 19, 97 S.Ct. at 1516 (footnote omitted) (emphasis added). The Court thus based its conclusion on three factors: (1) the importance of the bargained-for security provision; (2) the fact that the state made no effort to compensate the bondholders for any damages; and (3) the security provision was totally repealed and not just modified or otherwise replaced.[4]

The instant situation is demonstrably distinguishable. First, although the security provision is concededly important, the express language of the proposed Charter Amendment provides for compensation: "[t]he City Council may pay from the general fund any damages resulting from the impairment of the security of any bonds legally issued in reasonable reliance on an agreement terminated by subdivision 2." Second, this express language indicates that the security provided the bondholders is not being totally eliminated. Rather, it is being replaced with at least an arguably comparable provision.

The majority characterizes this provision as a "vague authorization to pay damages." I would not read the provision so restrictively. The general presumption is that legislative acts are presumed to be constitutional. The provision does not expressly limit the circumstances under which damages are to be paid; rather, it expressly recognizes the city's obligation under the contract. Implicit within that recognition is the obligation to compensate the bondholders for any loss occasioned by the elimination of the security provision, including the damages provided by the security provi-

sion sought to be repealed. The effect, for any failure of the bonds to be repaid, is to provide the bondholders compensation from the general fund and not from a special sales tax.[5] As the Supreme Court has noted in the context of the contract clause, "[t]he Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' " *Faitoute Iron & Steel Co. v. Asbury Park,* 316 U.S. 502, 514, 62 S.Ct. 1129, 1135, 86 L.Ed. 1629 (1942). Nor is the Charter Amendment indicative of "studied indifference to the interests of the [bondholders or to their] appropriate protection." *W. B. Worthen Co. v. Kavanaugh,* 295 U.S. 56, 60, 55 S.Ct. 555, 556, 79 L.Ed. 1298 (1935). Instead, the recognition of the city's obligation to pay damages evinces the utmost solicitude and concern for the property rights of the affected bondholders.

It should be noted that if the charter provision did impair the obligation to the bondholders, it would not necessarily be unconstitutional. "[T]he prohibition is not an absolute one and is not to be read with literal exactness." *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934). The standard is that the impairment is constitutional if it is "reasonable and necessary to serve an important public purpose." *United States Trust Co. v. New Jersey,* 431 U.S. at 25, 97 S.Ct. at 1519. As the Court recognized in *United States Trust,* however, "[t]he extent of impairment is certainly a relevant factor in determining its reasonableness." *Id.* at 27, 97 S.Ct. at 1520.

In the instant case, any possible impairment by the substitution of the protections afforded by the Charter Amendment for the repealed provisions would be insignificant.[6] Although the majority indicated

---

4. The Court noted, at this juncture, that among those factors presumed to be bargained for is contemporaneous state law. *Id.* at 19, n.17, 97 S.Ct. at 1516, n.17. This issue was discussed in the previous section.

5. There is no impairment of security insofar as security is now provided from general funds rather than a special tax. General funds were

not pledged as security before, nor is there any indication that the City is insolvent or otherwise unable to pay damages out of the general fund.

6. Because there is a substitute provision with damages provided for, this is also not the situation proscribed in *United States Trust* where an impairment is upheld merely because it does

that the standard of scrutiny is no less strict where the harm to bondholders is minimal, it did indicate that the state retained the power to abrogate contracts pursuant to the powers of eminent domain, with just compensation. *Id.* at 29, n. 27, 97 S.Ct. at 1521, n. 27. Concededly, the city has not used its power of eminent domain here, but it has provided for compensation and damages. In this regard, the proposed Charter Amendment would afford the bondholders substantially the same protection as that afforded by the security provision.

3. Implicit in the conclusion that the proposed Charter Amendment would not impair the rights of the bondholders is that the instant situation concerns impairment of performance, not obligation. The rule is that the contract clause does not provide a remedy for breach of contract, but only for impairment of contract "[I]t is important to note the distinction between a statute that has the effect of violating or repudiating a contract previously made by the state and one that impairs its obligation." *Hays v. Port of Seattle*, 251 U.S. 233, 237, 40 S.Ct. 125, 126, 64 L.Ed. 243 (1920); *cf. St. Paul Gas Light Co. v. St. Paul*, 181 U.S. 142, 21 S.Ct. 575, 45 L.Ed. 788 (1901).

In *E & E Hauling, Inc. v. Forest Preserve District*, 613 F.2d 675 (7th Cir. 1980), the United States Court of Appeals presented a thorough explanation of the significance of the difference between breach of contract and impairment of contract in the context of the contract clause:

The Supreme Court * * * has drawn a distinction between a breach of a contract and impairment of the obligation of the contract. The distinction depends on the availability of a remedy in damages in response to the state's (or its subdivision's) action. If the action of the state does not preclude a damage remedy the contract has been breached and the non-breaching party can be made whole. If this happens there has been no law impair-

ing the obligation of the contract. * * * A state or its subdivision also may breach a contract and when it pays damages the obligation of the contract has also been dissolved. * * * Use of law normally will preclude a recovery of damages because the law will be a defense to a suit seeking damages unless it is clear the law is not to have that effect.

*Id.* at 679 (footnote omitted) (citations omitted).

Granted, the proposed Charter Amendment constitutes a breach of the city's contract with the bondholders. It does not, however, impair the city's obligation to compensate the affected bondholders; rather, the bondholders have available the right to bring suit for damages resulting from the breach. In the instant situation, there is no law which may be interposed as a defense against an action for damages: the Charter Amendment explicitly recognizes the obligation of the city to compensate the bondholders. Moreover, under Minn.Stat. §§ 465.13–14 (1980), municipalities are empowered to pay money judgments. There is also no indication that the city will be, or is, unwilling to compensate the bondholders as authorized or that the damage remedy is otherwise a sterile right. Because the Charter Amendment does not preclude a damage remedy—instead it provides for one—the instant situation involves a breach of contract not within the ambit of the contract clause. The Charter Amendment, therefore, should not be read as an expression of an intent to terminate the city's obligation. For these reasons, I would find that there has been no impairment of contract in violation of the contract clause and that the actions of the city in not submitting the Charter Amendment for referendum approval were unjustified.

I wish to add at this point that construction of the stadium is nearly completed. Thus, I am not concerned here with the merits of a domed stadium in Minneapolis,

not totally destroy the bondholders' rights. *See United States Trust Co. v. New Jersey*, 431 U.S.

at 27, 97 S.Ct. at 1520.

but I am concerned with the rights of citizens and taxpayers to have a voice in how construction of such a stadium is to be funded. The record is permeated with blatant efforts to avoid a citizen referendum, the effect of which was to circumvent the home rule amendment to the Minnesota Constitution. I fear the majority opinion has condoned that practice here and will encourage both the legislature and the local units of government to attempt further weakening of the home rule amendment. Accordingly, I dissent.

WAHL, Justice (dissenting).

I join the dissent of Justice Yetka.