ROYAL LIQUOR MART, INC. *et al.*, Plaintiffs-Appellants, v. THE CITY OF ROCKFORD *et al.*, Defendants-Appellees (United Bank of Illinois, Trustee, Counterplaintiff-Appellee, v. Royal Liquor Mart, Inc. *et al.*, Counterdefendants-Appellants).

Second District   No. 84—0471

Opinion filed June 12, 1985.

Eugene I. Pavalon and Stephen J. Feinberg, both of Asher, Goodstein, Pavalon, Gittler & Greenfield, and Robert F. Coleman, Kenneth P. Ross, and Eugene J. Schiltz, all of Freeman, Atkins & Coleman, both of Chicago, and Sam J. Cannariato, of Rockford, for appellants.

Charles E. Box and Franklin Cook, both of Rockford, for appellee City of Rockford.

James Spiotto, Ann Acker, and Susan C. Hummel, all of Chapman & Cutler, of Chicago, for appellee United Bank of Illinois.

John W. Rosenbloom and Williams & McCarthy, both of Rockford, for appellee Rockford Metropolitan Exposition, Auditorium and Office Building Authority.

Peter Alexander, of Alexander, Cicero, Flanders & Engelsma, P.C., of Rockford, for appellees Midwest Petroleum Marketing Association and John W. Javurak.

JUSTICE HOPF delivered the opinion of the court:

Plaintiff, Royal Liquor Mart, Inc., Hollywood Food Services, Inc., and August Sacco, brought this suit as a class action (Ill. Rev. Stat. 1983, ch. 110, par. 2—801 *et seq.*) to enjoin the city of Rockford from collecting a 1% sales tax on food, beverages, liquor and rentals on hotel and motel rooms, and to recover all taxes collected thereunder since April 14, 1983. Plaintiffs contend that the sales tax ordinance, No. 1978-52-0, enacted April 14, 1978, as an exercise of the city of Rockford's home rule power pursuant to article VII, section 6(a), of the Illinois Constitution (Ill. Const. 1970, art. VII, sec. 6(a)) became invalid when the city's home rule powers were repealed by referendum held on April 12, 1983, and certified on April 14, 1983. Consequently, it is claimed that the city lost its authority to collect this tax as of that date.

The Rockford Metropolitan Exposition, Auditorium and Office Building Authority (authority) and the United Bank of Illinois (trustee) were granted leave to intervene. They further filed answers, affirmative defenses, cross-motions for summary judgment or in the alternative judgment on the pleadings and in the case of the trustee a cross-complaint for declaratory relief and damages.

On cross-motions for summary judgment filed in accordance with section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005), the circuit court of Winnebago County ruled in favor of the defendant city and upheld the tax. Likewise it granted the motions for summary judgment of the authority and trustee, and in the case of the trustee granted its counterclaim for declaratory relief (Ill. Rev. Stat. 1983, ch. 110, par. 2—701). The court denied plaintiffs' motion for summary judgment. The city continues to collect this tax. The plaintiffs appealed. We affirm.

Plaintiffs filed their revised second amended complaint on November 3, 1983, asking for declaratory relief and damages (Ill. Rev. Stat. 1983, ch. 110, par. 2—701). On November 3, 1983, their claim was cer-

tified as a class action for all persons and entities who paid or collected the 1% sales tax after April 14, 1983. Plaintiffs, Royal Liquor Mart, Inc., and Hollywood Food Services, Inc., were deemed proper parties to represent the interests of the collecting agents. Plaintiff, August Sacco, was deemed a proper representative of the class who paid the 1% tax in Rockford.

The first issue to be considered is whether the trial court erred in granting defendants' summary judgments and denying plaintiffs'. One of the bases of the trial court's decision was that as a matter of law the tax was validly adopted and levied and remained valid "so long as such tax is pledged to *** and supports a valid obligation," despite the repeal of home rule.

The second question to be considered arises from the fact that some of Rockford's 1% sales tax was earmarked to fund "any operating deficit" of the Rockford "Metro Centre," the exposition building to be constructed. The authority issued bonds to fund the development of the Metro Centre, and the city agreed to enact the 1% sales tax described herein, in accordance with the terms of an amended intergovernmental agreement entered into between the city and the authority on May 26, 1978. Under the terms of the amended agreement the trustee is to provide funds monthly. The agreement states in paragraph 3.04(c)(ii):

"Each month thereafter until all bonds issued by the Metro Authority and supported by State Funding are retired, the trustee shall continue to pay to the Authority each month's reported Operating Deficit, if any. *** If, for any reason, the sales taxes levied herein shall be declared invalid by a court of competent jurisdiction, or shall otherwise not provide sufficient funds for the purposes of paying the Operating Deficit of the Metro Authority, the City shall enact such other tax or taxes, or take such other actions as may be necessary and appropriate, to provide for paying the Operating Deficit; provided, however, that in no event shall the Metro Authority be the recipient of any income resulting from taxes as are or may be levied on the personal or real property in the City of Rockford."

The city, the trustee and the authority all contend that the invalidation of the sales tax would be an unconstitutional violation of the contract clauses of the Constitution of the United States, article I, paragraph 10 (U.S. Const., art. I, sec. 10) and the Illinois Constitution, article I, paragraph 16 (Ill. Const. 1970, art. I, sec. 16). The trial court agreed, and the propriety of its ruling is the second issue to be addressed.

The court, in considering the defendants' cross-motions for summary judgment, determined there was no genuine issue of material fact, and that the defendants were entitled to judgment as a matter of law, and ruled in favor of the trustee on its countercomplaint for declaratory relief, and denied the plaintiffs' motion for summary judgment. The court upheld the sales tax and held that the city could continue to collect it. The court stated that on the basis of the bond ordinance and the agreements:

"[T]he Bondholders and the Authority established contract rights and vested rights which are protected by the Constitution of the United States, Art. 1, sec. 10, which provides no state shall pass any law impairing the obligation of contracts, and by Illinois Constitution, Art. 1, sec. 16, which provides no law impairing the obligation of contract shall be passed."

The authority was originally established in 1969 as part of a statewide civic center program, and was authorized to construct, equip and maintain auditorium, exposition and office buildings for the purpose of promoting "expositions, conventions, theatrical, sports and cultural activities." (Ill. Rev. Stat. 1981, ch. 85, par. 1334.) The authority also had the right to issue interest-bearing revenue bonds which would be payable from income derived from civic activities and from funds received by the authority from any other source. Ill. Rev. Stat. 1981, ch. 85, par. 1340.

The city passed ordinance No. 5 on July 11, 1978. The purpose of this bond ordinance was to permit the authority to issue Metro Centre bonds. In article VI[3] of this ordinance it provides that its terms constitute a contract between the authority and the bondholders.

Another mechanism for funding was created by the State Legislature in 1970. The Metropolitan Civic Center Support Act provided for the creation of "the Metropolitan Exposition, Auditorium and Office Building Fund in the State Treasury into which shall be paid the proceeds of taxes provided in section 28 of the Illinois 'Horse Racing Act' of 1975." (Ill. Rev. Stat. 1981, ch. 85, par. 1393.) Under this provision a local exposition authority could apply for funds and, if certified by the director, become eligible for State financial support. The State would then pay the interest and principal to the local government, in an amount equal to the cost of amortizing revenue bonds issued by the unit of local government. Ill. Rev. Stat. 1981, ch. 85, par. 1394(3)(c).

While the Metro Centre was built with the bonds sold by the authority, the State agreed by statute to pay the principal and interest of those bonds. This agreement was also memorialized by an intergov-

ernmental agreement between the authority and the State. This agreement, dated May 30, 1978, set forth a general description of the plan for redevelopment of Rockford's central business district, and estimated the cost of the project to be "not less than $20,400,000" and $15,300,000 for the construction of the arena coliseum. By the terms of this agreement, the only condition of payment was that there would be an annual appropriation by the General Assembly, and the obligation to pay was to cease when the support bonds issued under the ordinance were no longer outstanding. The agreement also describes the State's obligation to pay as "unconditional." The State's share or "base sum" is defined as less than the full project cost. (Ill. Rev. Stat. 1981, ch. 85, par. 1394(3).) Under the ordinance issuing the bonds of the authority, the bonds were secured first by the revenues of the authority and, secondly, by the support funds from the State, if authority revenues were inadequate. Thus, both the city, by means of the sales tax, and the State, by means of the support funds, guarantee the operation of the authority while the bonds are outstanding. Between August 1978 and April 1983 the city tax was collected and applied to the redevelopment fund administered by the trustee. This redevelopment fund was funded by the city as part of the intergovernmental agreement between the city and the authority, under which the city also agreed to sell the land to the authority. Although the operations have incurred regular deficits, the authority states that the General Assembly voted each year since 1978 to appropriate sufficient funds to cover the financial obligation of the authority to the bondholder. The parties agree that the tax was valid prior to the referendum which repealed home rule.

■ Turning to the first issue raised on appeal, the plaintiffs argue that the repeal of home rule powers is the equivalent of the repeal of the sales tax.

The State's Attorney of Winnebago County, prior to the referendum, requested an opinion of the Attorney General on the effect that a repeal of home rule powers would have on the city's taxing powers. The Attorney General in opinion No. 83—005, dated March 11, 1983 (1983 Ill. Att'y Gen. Op. No. 83—005), states that it would be his opinion that the city of Rockford would lose the power it had to tax and raise revenue, and under only limited situations would it be empowered to collect taxes theretofore levied. There are no cases that directly confront the issue presented by the plaintiffs herein. For reasons discussed below, the Attorney General opinion does not provide guidance to the problems presented in this case. It should also be noted that Attorney General opinions are entitled to be considered

only to the extent that they are well reasoned. *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117, 384 N.E.2d 310.

There is no factual dispute presented in the case before us. Plaintiffs argue that the referendum which repealed Rockford's home rule powers in effect repealed the sales tax enacted pursuant to that home rule power. We believe the trial court properly held that the sales tax should remain in effect so long as it is pledged to and supports a valid obligation.

The referendum in issue was brought pursuant to section 6(b) of article VII of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VII, par. 6(b)). This section provides simply that "[a] home rule unit *** may elect not to be a home rule unit." Even if we were to assume that any language regarding the sales tax was included in the referendum, we believe it could be argued that the tax, once lawfully enacted, could no longer be repealed. Once Rockford's elected officials had the authority to levy the tax and did so, a subsequent repeal of home rule power does not necessarily repeal a tax that has been previously levied. Plaintiffs would have had a voice, even though advisory only, in the levy of the subject tax if, prior to its passage, a specific question of the desirability of the sales tax had been submitted to the electorate pursuant to the statutory procedures for submitting questions of public policy through referendum. (Ill. Rev. Stat. 1983, ch. 46, par. 28—1 *et seq.*) However, this remedy was not employed by plaintiffs herein.

It has been generally held that the validity of a tax levy is determined at the time the levy was made. Where a challenge was made to a tax levy for school purposes, the court employed the following language, which is of interest here:

"There are other well-established principles of law pertaining to the adoption of a budget or appropriation ordinance which are closely related to the principle involved. They are that taxing bodies are created for the purpose of levying taxes and administering the business affairs of the municipality for which they act. They are vested with the power to ascertain and fix the amounts necessary to be raised by general taxation to meet its corporate needs. (*People ex rel. Toman v. Central Plaza Hotel Corp.* 375 Ill. 114.) The power to levy a tax is not a judicial function. (*School Directors v. School Directors*, 232 Ill. 322.) The validity of a levy is to be determined as of the time the levy was made. Facts arising out of subsequent events can not be used to defeat the intent and purpose of the taxing body that made the levy. *People ex rel. Salm v. Scott*, 300 Ill. 290."

(*People ex rel. Schlaeger v. Siebel* (1944), 388 Ill. 98, 107, 57 N.E.2d 378, 381-82.)

More recently, in the case of *In re Application of Du Page County Collector* (1983), 118 Ill. App. 3d 139, 454 N.E.2d 827, this court considered the question of an objection to a levy for township road bridges and equipment. Although we found that certain certification procedures had not been followed, we did state that the validity of a tax is determined as of the time of the levy at the rate when levied and not when the tax is extended. Though there is no extension of the tax which is in issue here, *In re Application of Du Page County Collector* affirms the principle that the validity of a tax is determined at the time it is levied rather than at some subsequent time.

The Attorney General opinion takes the position that the drafters of the 1970 Illinois Constitution contemplated two types of local government, home rule and non-home-rule. It analogized the abolition of home rule with the repeal of a statute without a savings clause, in which case, "[e]xcept as to proceedings passed and closed, [the statute would be treated] as if it never existed." (1983 Ill. Att'y Gen. Op. No. 83—005, slip op. at 2.) Referring to "Dillon's Rule," the Illinois Constitution 1970, article VII, paragraph 7, and *Consumers Co. v. City of Chicago* (1924), 313 Ill. 408, 411-12, 145 N.E. 114, the opinion offers the advice that when a municipality ceases to be a home rule unit its tax powers are governed by statute, implying that if a current statute did not provide for collection of a tax then no such tax could be collected. We note that the opinion never made the distinction between levying and collecting a sales tax. It is not clear that the opinion contemplated the sales tax as an issue.

We believe the 1983 Ill. Att'y Gen. Op. No. 83—005 may be read as supporting a continuation of the Rockford sales tax. Although it stated that a municipality which ceases to be a home rule unit is subject to all statutory limitations on the exercise of taxing powers, it did set out one exception to this conclusion. The opinion stated:

"The only exception to this conclusion concerns debt service levies made for the purpose of paying principal and interest on bonds, notes and obligations secured by ad valorem property taxes. In such cases, the levying of a tax occurs only once, even though taxes may be extended and collected over a number of years. (1981 Ill. Att'y Gen. Op. 72, 74.) Consequently, the act of levying and extending a tax under home rule powers for debt service purposes will not be affected by a subsequent return to non-home-rule status, because the levy will be complete before the municipality ceases to be a home rule unit." 1983 Ill.

Att'y Gen. Op. No. 83—005, slip op. at 4.

Although this exception could be limited to debts secured by *ad valorem* property taxes and the tax in question is a sales tax, however, the exception could also be read to include the sales tax in issue here. The third question posed to the Attorney General asked what effect passage of a referendum repealing home rule would have on the extension of debt service levies imposed by the city under the grant of the home rule powers. The response was:

"In response to your third question, it is my opinion that the city of Rockford will be precluded from imposing any taxes not statutorily authorized to be imposed by a non-home-rule unit, except for the extension of taxes under a debt service levy completed prior to the abandonment of home rule status." (1983 Ill. Att'y Gen. Op. No. 83—005, slip op. at 4.)

This provision could also be read as authorizing an "extension of taxes" where the tax was levied during the time when home rule status was in effect. In any event, the opinion overall does not clearly address the questions that are presented in the instant case.

We deem the cases cited by plaintiff and referred to in the 1983 Ill. Att'y Gen. Op. No. 83—005 are largely inapposite as they do not involve the issue of the extent of the grant of municipal powers or the levy of a tax by a public body. We agree with the position of the city that the Attorney General opinion did not state that the loss of home rule would invalidate a prior and valid exercise of home rule powers, such as the sales tax in the instant case.

The Illinois Constitution of 1970, article VII, paragraph 7(m), provides that the powers and functions of home rule units shall be construed liberally. This provision has been given vigorous enforcement by the courts. For example, in considering whether there is a conflict between an act and a power of home rule municipality, the courts have required that any restriction by the State legislature be made express in a State statute. (*Village of Hoffman Estates v. Union Oil Co.* (1977), 56 Ill. App. 3d 52, 370 N.E.2d 1304, 1307.) Although the instant case involves the effect of an ordinance upon the repeal of home rule authority, it should be stressed that if the tax levied in the instant case is found to be of no force and effect upon the repeal of home rule, then the validity of any tax levied, or for that matter any ordinance passed pursuant to a municipality's home rule authority, will be seriously weakened by the possibility that that ordinance or tax levy would be invalidated by a municipality's determination that it no longer wished to be a home rule unit. Stated in another fashion, if a referendum repealing home rule status is viewed as repealing all the

ordinances and commitments made by the municipality during the time of its home rule status, then the municipality could not make long-term commitments, and the electorate could not rely upon home rule solutions to problems without fear that the solution will be invalidated at some point in the future. The concept of home rule would certainly be altered and much weakened.

In light of the constitutional provisions mentioned herein, as well as the case law which has construed home rule units as having the same powers as the sovereign except where powers are limited by the General Assembly (*City of Urbana v. Houser* (1977), 67 Ill. 2d 268, 273, 367 N.E.2d 692, 694), the continued validity of enactments made by Rockford during its home rule status is desirable. Further, if the referendum is construed as repealing all acts of Rockford while it was a home rule unit, the effect on the body of law enacted during the period of time Rockford enjoyed home rule would be quite unpredictable.

The sales tax ordinance passed by Rockford in 1978 sets forth a period of time under which it would constitute a levy, 20 years or upon the retiring of all bonds issued by the Metro authorities and supported by State funding, whichever is later. It has been held that a municipality can have a tax imposed for a period of time necessary to pay the underlying debt or levy. (*Davis v. Brace* (1876), 82 Ill. 542.) It has also been held that a tax is levied at the time it is imposed by the legislative body. (*Morrison v. Moir Hotel Co.* (1917), 204 Ill. App. 433, 435.) Thus, the act of collecting the tax is an administrative function, and it is the act of determining and fixing the amount of the tax that constitutes its levy. (*People ex rel. Carr v. Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.* (1925), 316 Ill. 410, 147 N.E. 492, 493.) Therefore, because the tax was levied at a time when the city of Rockford had the authority to levy, there is no reason to presume that the subsequent referendum repealing home rule authority invalidates the future collection of the sales tax. Because the burden of establishing the invalidity of the tax rests upon the objector (*In re Application of Du Page County Collector* (1983), 118 Ill. App. 3d 139, 454 N.E.2d 827, 834), and because the plaintiffs herein have presented no clear authority to support their contention, we believe the trial court's determination that the tax should be given continued effect should be affirmed.

The second issue to be considered results from the fact that the trial court held that the bondholders and the authority had a contractual right to continued collection of the sales tax in issue and that the parties had established contractual rights and obligations which

are protected by the contract clause set forth in article I, section 10, of the United States Constitution (U.S. Const., art. I, sec. 10), which provides no State shall pass any law impairing the obligation of contracts. The court also referred to a similar provision found in the Illinois Constitution (Ill. Const. 1970, art. I, par. 16).

■ The thrust of plaintiffs' contention is that the trial court erred in finding an impairment of contractual obligation because the amended intergovernmental agreement dated May 26, 1978, which required the city to enact the tax, provided for alternate financing if revenues were needed to fund a deficit incurred by the authority. The language relied upon by plaintiffs is set out earlier in this opinion and provides that if for any reason the taxes are declared invalid or if sufficient funds are not available, "the City shall enact such other tax or taxes or take such other actions as deemed necessary and appropriate, to provide for paying the Operating Deficit; ***." There are at least two contracts which arguably would be impaired by a finding that the sales tax ordinance is not enforceable. Aside from the agreement between the city and the authority, there is also a contractual relationship between the bondholders and the authority, creating a third-party beneficiary relationship.

In *Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983), 459 U.S. 400, 74 L. Ed. 2d 569, 103 S. Ct. 697, the Supreme Court set forth a three-step approach to determine whether a contract has been unconstitutionally impaired. Although the court was considering whether a State law causes impairment of a contractual relationship, it is fairly reasonable to presume that the referendum in issue here could be looked upon as the equivalent of a State law.

The first question to be asked is whether the action in question has operated as a substantial impairment of a contractual relationship. If such impairment is found, the State must show a significant and legitimate public purpose behind the regulation. The third step requires that once such a purpose of the regulation has been identified it must be determined if the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose of the regulation. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983), 459 U.S. 400, 412-13, 74 L. Ed. 2d 569, 581, 103 S. Ct. 697, 705-06.

The thrust of plaintiffs' contention is that the contract contemplated the possibility that the sales tax might be declared invalid, struck down or repealed, and that because the contract provided for that possibility there has been no impairment in the instant case. However, plaintiff fails to show exactly how the city would find an al-

ternative source of funds to take the place of the sales tax. The sales tax was the basis of the amended intergovernmental agreement, and although it does have language which would require the city to fund the operating deficits upon a finding of invalidity of the sales tax, there is no indication in the record of this case how the city would go about providing alternative funding. The fact that it is no longer a home rule municipality severely curtails its ability to raise taxes. Additionally, the same language in the amended intergovernmental agreement which arguably requires the city to enact another tax if the sales tax is found invalid contains a limitation that the authority cannot receive any taxes levied on personal or real property in the city of Rockford. Thus, while plaintiffs argue that the contract provides for "other city funding," there is simply no basis in the record to presume that other city funding is available or could be made available by a non-home-rule municipality. For reasons which follow, the trial court correctly ruled that the bondholders and the authority established contractual rights and vested rights which would be impaired by a determination that the city could no longer collect the sales tax it had levied.

Plaintiffs' contention that the invalidation of the sales tax was within the reasonable expectations of the parties to the agreement is without merit. Plaintiffs urge that *Continental Illinois National Bank & Trust Co. v. Illinois State Toll Highway Com.* (1969), 42 Ill. 2d 385, 251 N.E.2d 253, provides authority for the proposition that a contract which contemplates a transfer of authority which affects the contract rights of the bondholders under an agreement does not result in the impairment of the contract. However, *Continental Illinois* is factually distinguishable from the case at bar. In *Continental Illinois*, the trustee for Illinois Toll Highway Revenue Bonds argued that the Illinois State Toll Highway Authority Act (Ill. Rev. Stat. 1969, ch. 121, pars. 100—1 through 100—35), which created a new toll authority, was unconstitutional. Because the bond resolution in that case revealed that the possibility of a transfer of authority between commissions was contemplated and provided for, the court held that there was no impairment of the contractual rights to bondholders. By contrast, in the case at bar there is no transfer of the power from one State authority to another, and there was no showing that the parties contemplated a repeal of home rule.

Plaintiffs also cite the case of *Northwestern National Life Insurance Co. v. Tahoe Regional Planning Agency* (9th Cir. 1980), 632 F.2d 104, where bondholders sued alleging that certain rezoning would impair their contractual rights. The ninth circuit held that there had

been no impairment because the bondholders had never been guaranteed that the lands in issue would be free from restrictive zoning. Thus, the court held that there had been no impairment of the obligations of the parties to the bonds. By contrast, in the case at bar the sales tax ordinance was the very basis of the bargain. The intergovernmental agreements specifically promised to pass the sales tax in issue.

The trial court did consider the language contained in the agreement, which provided that if the sales tax was declared invalid then another tax or other action for paying the operating deficit should be provided. The trial court interpreted that clause to refer to two cases that were pending in 1978 before the circuit court of Winnebago County, and which challenged the constitutionality of the sales tax ordinance. (Rue March, Inc. v. City of Rockford (No. 78 MR 72), and Kona Liquors, Inc. v. Rockford Metropolitan Exposition, Auditorium and Office Building Authority (No. 78 MR 119), which cases upheld the ordinance as a valid exercise of home rule power by the city.) Plaintiffs contend that there is no basis upon which to conclude that the clause in issue should be limited to the two cases which attacked the constitutionality of the sales tax. Assuming plaintiffs were correct in their assertion on this point, this does not mean that the finding of an invalidity of the sales tax would not create an impairment of the contracts in issue. While plaintiffs argue that there are a number of cases where courts have held that contract rights are not impaired when a municipality simply changes the source of funds from which it meets a particular obligation, they fail to state how the change will occur in the instant case. They argue there is no basis for inferring that the city is unable to make the payments required of it. This view infers that the city has some unlimited source of revenue which it can tap into to replace the revenues it would have collected from the sales tax. At this point no such inference can be made. Nonetheless, as discussed in the first issue of this case, the tax was validly adopted and levied while the city was a home rule unit and the subsequent referendum which repealed home rule authority did not repeal the validity of the tax.

The trustee argues, and we agree, that the city agreed to impose a sales tax in its contract with the authority as a form of security for the bond and this was actually done for the benefit of the bondholders. Citing cases which have held that the legislature does not have authority to reduce the tax rate on bonds which were issued pursuant to its authorization (*People ex rel. Browne v. Chicago & Eastern Illinois R.R. Co.* (1921), 300 Ill. 467), the trustee contends with some de-

gree of merit that if contract obligations can be avoided by the referendum in issue, then even that referendum is subject to constitutional challenge.

In *United States Trust Co. v. New Jersey* (1977), 431 U.S. 1, 52 L. Ed. 2d 92, 97 S. Ct. 1505, the Supreme Court pointed out that legislation authorizing a bistate construction project could not be repealed when the security to the bondholders would be affected. In that case the trial court found that even though the extent of the loss to the bondholders was unascertainable, contract impairment would nevertheless result. (431 U.S. 1, 19, 52 L. Ed. 2d 92, 107-08, 97 S. Ct. 1505, 1516.) The *United States Trust* case does support the trial court's determination that an impairment to contracts would result from a determination that the sales tax was not collectable.

In *Davies v. City of Minneapolis* (Minn. 1982), 316 N.W.2d 498, after the city had entered into an agreement to levy a tax to assist in financing bonds issued for a domed stadium, an amendment was proposed to the city charter which would repeal the tax. Plaintiffs sought a *mandamus* to compel an election on the proposed amendment. The supreme court of Minnesota upheld an order quashing the *mandamus*. The court found that the amendment would unconstitutionally impair the contract rights of the bondholders. In *Davies* the proposed amendment stated that the city could pay from the general fund damages resulting from the impairment of the security of the bonds. Nonetheless, the court found that there was no comparable security to cover the tax loss. (316 N.W.2d 498, 504.) Similarly, in the case at bar, although there was contract language allowing payment from alternative sources, there is still an impairment of the security of the bonds. In the instant case the sales tax was an integral part of the agreement entered into by the parties. The vague language which allowed the city to find other sources of revenue to fund operating deficits falls far short of providing sufficient security such that it can be said that the contract would not be impaired by the loss of the sales tax revenue.

Applying the concepts set forth in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983), 459 U.S. 400, 412-13, 74 L. Ed. 2d 569, 581, 103 S. Ct. 697, 705-06, the referendum in issue would operate to substantially impair the contractual relationships of the parties if the sales tax is invalidated. Additionally, under the second step in this analysis we do not believe that a legitimate public purpose for repealing the contract would be met.

Finally, though it could be inferred that the parties may have reasonably foreseen that someday Rockford's home rule status would be

repealed by referendum, we do not believe they could reasonably expect that the repeal of home rule would also repeal all actions taken by the city during that period.

In accordance with the principles enunciated in *Energy Reserves,* we are of the opinion that the interruption in the collection of the sales tax would constitute an impairment under the contract clause. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983), 459 U.S. 400, 412-13, 74 L. Ed. 2d 569, 581, 103 S. Ct. 697, 705-06.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

STROUSE and SCHNAKE, JJ., concur.