BENJAMIN L. T. BOURLAND, Appellant, *v.* THE COUNTY OF PEORIA *et al.*, Appellees.

### APPEAL FROM PEORIA.

The County Commissioners of Peoria surveyed and platted the town of that name, and sold the lots; the surveyor was to have two lots for his services, and, at the sale, two lots were marked on the list of lots as sold to him, an allowance having been made for his services corresponding with the price of the lots, which allowance was not called for by the surveyor: *Held,* that these several memorandums were sufficient to take the case out of the statute of frauds, as between the county and the surveyor.

But such entries, orders, and proceedings, are not constructive notice of the sale to subsequent purchasers.

Bourland *v.* The County of Peoria et al.

The records of the County Commissioners' Court, showing sales of land, are not notice; the purchaser should have his title recorded in the proper office.

If the County Commissioners sell land to A, and take the pay therefor, and do not give title, and six years afterwards sell the land to B., they will be held, as trustees, to pay A. the price received from B., with interest thereon.

The bar of the statute of limitations, will not be applied short of the time that would bar an ejectment.

The complainant by his bill alleges, that, on May 2nd, 1826, the county of Peoria was possessed of north-east fractional quarter section nine, township eight north, range eight east of fourth principal meridian, on which the seat of justice for that county had been located, and then was located. County having acquired a pre-emption right to the land under the act of 26th May, 1824.

On said 2nd May, 1826, county commissioners, at a session of court, passed the following order, which was entered of record:

" ORDERED, That the town of Peoria be re-surveyed; that the streets all run parallel with the river; the front street shall remain the same width it now is, and all the other streets shall be one hundred feet wide; that the blocks remain the same size they now are. Each full lot to be seventy-two feet front and one hundred and eighty feet deep; that each full lot shall contain ten lots; and that William Holland be authorised to employ suitable persons to complete the same, under his superintendence."

On the same day, the court made and entered of record, an order, as follows:

" ORDERED, That the clerk of this court be authorized to advertise a sale of lots in the town of Peoria, on the 10th day of July next, and that the terms of sale be as follows: ten per cent. cash, and the residue in twelve and eighteen months."

Holland employed William S. Hamilton to survey the town, under the order, who did so under the superintendence of Holland, the price of the work being $58.75.

On the 8th July, 1826, the county commissioners' court passed the following order, which was entered of record:

" ORDERED, That the following be the terms of sale of lots in the town of Peoria, at the sale on the 10th day of July, A. D. 1826, to wit: purchasers to pay ten per cent. down, and the balance in three equal payments, at six, twelve, and eighteen months, and give notes. Purchasers who do not comply with the above conditions, will make themselves liable for the ten per cent. on such lot or lots as they may bid off, as a forfeiture, without any claim on such lot or lots. County orders will be received for any part or the whole of the purchase money. No title will be given until the terms of the sale are complied with, and the patent received."

On the 10th July, 1826, county commissioners agreed that Hamilton should have two lots for making the survey. On the

12th July, 1826, said court made and entered of record the
following order:

" ORDERED, That the treasurer pay William S. Hamilton fifty-eight dollars and
seventy-five cents, for surveying the town of Peoria, for which he has agreed to
take two town lots."

On the same 12th July, 1826, said court caused to be en-
tered on their records a list of lots in Peoria, sold at the sale
on the 10th of same month, by which it appears that Wm. S.
Hamilton purchased lots eight and nine in block one, in Peoria,
for $58.75.

That, in fact, Hamilton bid off said two lots, in payment for
the sum the county owed him.    That the orders and entries of
the court show that fact, and are notice to all subsequent pur-
chasers.

Since the town was laid off, it has been incorporated as a city,
and is now called the city of Peoria.

County commissioners have never made a deed to Hamilton
or complainant; but, on the contrary, about the 2nd May, 1832,
sold the lots to one George Morton for $200; worth then
$1,000; and on 7th March, 1835, made a deed to Morton for
said lots.    Worth then $1,500.

That, before the deed to Morton was made, on 2nd Dec., 1833,
the sale to Morton was rescinded by the county commissioners'
court, and on the 4th June, 1834, the rescinding order was re-
scinded.    Hamilton never demanded a deed; such demand
would have been useless after the sale and deed to Morton,
in 1835.

On the 1st March, 1837, Morton conveyed lot eight to Wil-
liam Morrison.

On the 15th March, 1836, he conveyed the undivided half of
lot nine to Joseph C. Laville.

On the 8th March, 1836, *Morton* conveyed the undivided
half of lot nine to Peter Livingston and Andrew Corey.

The bill, then, shows several subsequent conveyances of lot
nine to various persons, who are made defendants.

On the 8th April, 1849, Wm. S. Hamilton sold and conveyed
all his interest to the complainant, and copy of deed exhibited.

Complainant charges that defendants hold the lots, or parts
of them, in trust for him; he having the oldest equitable title;
they being subsequent purchasers, with notice of his equity.
Defendants have failed to make a deed, either to Hamilton or
complainant.    That the county failed to pay Hamilton or com-
plainant the value of the lots, at the time they were sold to
*Morton*, or at the time they were conveyed to him, or the value
of the lots at this time, nor ever paid Hamilton or complainant

anything on account of said lots, or the sale thereof to Hamilton.

The bill prayed that defendants may be compelled to convey said lots to complainant; that if this specific relief cannot be granted, the county of Peoria be compelled to pay him the full value of said lots in money; and for general relief.

The bill was filed Aug. 9, 1849.

The answer of the county of Peoria, admits the ownership of land, location of the county seat, and all the orders of the county commissioners' court, as charged.

Denies that there was any specific agreement between county and Hamilton, as to lots eight and nine, other than appears in said exhibits. Insists that Hamilton should have complied with terms of sale, and taken a *bond*, or writing, as evidence of the sale, which was not done.

That, at the time of sale to Morrison, county had no notice of a sale of those specific lots to Hamilton; he not having complied with the terms of the sale, presented any certificate or order to the treasury, etc.

Denies that Hamilton received the lots for the sum due him from the county, as charged, although he might have so designed.

Denies that lots were, at the time of the sale to *Morton*, worth $500 each; Morton paid the full value for them, $200.

That Hamilton's claim to the lots and the money is barred by lapse of time, more than twenty years having accrued since the sale to him. (Sale to Morton, May 2, 1832; deed to him, March 7, 1835; bill filed Aug. 9, 1849.)

Insists that the debt, if any exists, from the county to Hamilton, is not assignable, and that complainant has no right to sue therefor in his own name.

The *answer of Morrison* admits the ownership of the property by the county, and that it was laid out into lots, as stated in the bill. That the county sold and conveyed to Morton, for $200, as charged; and denies all the other allegations; and insists upon the lapse of time as a defense against complainant's equity.

The answer of *George Morton* admits the ownership of the county; that the land was laid out in lots; that lot (8) was sold to him by Morrison, and the undivided half of (9) to Laville, and the undivided half of said half to Miller and Griggs, and undivided half was sold and conveyed to Peter W. Livingston and Andrew Corey, as charged. Denies any knowledge of other conveyances.

Denies all the residue of the charges, etc., and insists on the lapse of time as a defense.

The answer of Stephen Griggs admits the county owned the land; sale to Morton, and deed to him; platting of the town;

the sale of the lots by *Morton,* and all the conveyances except that from Hamilton to complainant.

Denies all the other allegations in bill, and insists upon the lapse of time as a defense.

Report filed May 30th, 1853.

Same day bill taken as confessed, as to all the defendants except Morton, Morrison, the county, and Griggs, who alone had answered.

*The court, on hearing, dismissed the bill.*

Errors assigned: 1. Dismissing complainant's bill.

2. In not decreeing a conveyance of the lots, as prayed for.

3. In not rendering a decree in favor of complainant, for the value of the lots at the time of sale to complainant, or at time of sale or conveyance to Morrison, or at the time of filing the bill; with interest.

The cause was heard before PETERS, Judge, at March term, 1855, of the Peoria Circuit Court.

N. H. PURPLE, for Appellant.

MANNING and MERRIMAN, for Appellees.

SCATES, J. As between the county of Peoria and Hamilton, we have no doubt, from the allegations, exhibits and answers, that Hamilton purchased and paid for lots eight and nine, block one, in controversy. While the entries do not specify this arrangement particularly, yet taking the dates of the service in surveying and platting the town, the terms of sale and payment, the entry on the sale book, the price, and the allowance of the order for services, two days after, of the exact price of the lots previously bid off, and the memorandum as part of the allowance, the county order being receivable in full payment, etc., all taken together, with the fact that Hamilton never called for the county order, etc., and we can entertain no doubt that he bid off the two lots with the view to payment for his surveying, and that such was the mutual understanding and arrangement of the parties. These several memorandums are a sufficient writing and signing by the party to be charged therewith, to take the case out of the statute of frauds, and we think sufficiently mutual and certain in the description of, and as to, what property was sold, to be capable of a specific enforcement in a court of equity. 1 John. Ch. R. 274; 9 Paige R. 292; 3 Yerg. R. 23; 2 Vernon R. 416; 2 A. K. Marsh. R. 346; 4 Cond. R. 144; 2 Sumn. R. 293. We should have no hesitation in so holding in this case, and ordering the decree accordingly, if it were not for inter-

vening rights of third persons, who claim to be innocent pur-
chasers, without notice. And such they appear to us to be.

To sustain them as such, however, we must hold that the sale
book kept of that sale by the county commissioners' court, and
the order book in which they entered their official acts as a
court, were not constructive notice of such sale to subsequent
purchasers. The case is strongly put too, that ministerially and
individually, as county commissioners, the members of the court
had no power, under the laws, to act in relation to the surveying,
platting, ordering sales, fixing the terms and conditions of sale,
selling and conveying of the lands of the county, in town lots
or otherwise, but that their acts, or most of them, for these
purposes, must be as a court, and of their acts as such, the law
required a record to be kept. That being required to keep, and
having made and kept that record, it is notice of what it con-
tains, in relation to the title of the county, to all subsequent
purchasers of them. The recording acts for the purposes of
information and constructive notice, have not altered or abol-
ished the rules of equity, in relation to actual and constructive
notice, by other means than the recording acts. 2 Scam. R.
501; 4 ibid. 117. But while all this is true, it is also true,
that the legislature, and not the court, must add, and declare
the existence and effect of other records, as constructive notice
of title and incumbrance. Such effect is given to judgments,
by declaring a lien upon the lands in the county, without declar-
ing the existence of such judgment to be constructive notice.
But it must have such effect as notice, in order to give it effect
as a lien, and we must, consequently, so treat and hold it. Such,
too, is the effect of the levy of an attachment when followed by
a judgment.

So, too, I presume, would be the levy of a *fieri facias* from
another county, when levied before the statute which required
the filing of such levy with the circuit clerk and the recorder,
and declared its effect as notice to be from such filing. These
orders of the county court, and we may admit this sale book,
were records; but still every matter of record is not *construc-
tive* notice of the subject matter of it to all strangers. No such
effect has been given to these records by the recording or other
laws of the State, nor can such effect be claimed for them, by
reason of their affecting the land like judgments, and such
*mesne* and final process referred to. In tracing title to or
through the county, as through or from any other vendors, we
should go to the recorder's books, and to the judicial records
and levies, where evidences of conveyances, contracts, incum-
brances and liens are kept and to be found. *Chouteau* v. *Jones
et al.*, 11 Ill. R. 323. We conceive that the law would no more

require us to search the county records, for contracts or convey-
ances of land, than it would require us to search the private
depository of individual vendors.    It may be true that the
county commissioners could only bind the county by entries of
record, or by actual conveyance, and yet the place to notify and
charge strangers with their acts, is the same for them as for
individuals, and other corporations who may be able only to
bind themselves on the records of their company.    It is need-
less to go into an inquiry as to what acts of the county commis-
sioners' court are matters of record, and as to whom, and to
what extent, they are notice.    Persons may purchase of the
county, as they do of individuals, at their own hazard, without
investigating their title, protecting themselves or not, by cove-
nants ; and for the purposes of defeating the purchaser's title
from the county, by constructive notice or otherwise, the same
rules and evidences would apply alike to all, according to the
particular facts and circumstances of each individual case.

The county commissioners have been, since 1819, empowered
to sell and convey the real estate of the county.    See act, 1819,
p. 238, Sec. 3.    And this power has been continuous.    See Rev.
Stat. 1845, p. 108, Sec. 26 ; p. 135, Sec. 36.    During the *same
period,* deeds and conveyances have been required to be recorded,
without distinction as to the character of the vendors, or grant-
ors.    See act, 1819, p. 19, Sec. 8, which required them to be
recorded within twelve months.    Purple's Real Estate Stat.
460, Sec. 8, for same, under act of 1807.    This time was reduced
to six months by act of 1825, and which was in force when this
contract was made, on 10th July, 1826.    On the 31st January,
1827, the recording act was made to extend to, and embrace,
" all grants, bargains, sales, leases, releases, mortgages, defeas-
ances, conveyances, bonds, contracts, and agreements, of and
concerning any lands, tenements or hereditaments, or whereby
the same may be affected in law or equity ;" all of which were
required to be recorded within twelve months, and were adjudged
void unless recorded before a subsequent conveyance to a *bona
fide* purchaser or mortgagee should be recorded.    Purple's Real
Est. Stat. 479, Sec. 15.    Powers, letters of attorney, or agency,
concerning the sale, etc., of land, were required to be recorded.
Sec. 16.    The time was reduced again to six months, as to deeds
and conveyances, by act of 1829, ibid, p. 487, Sec. 4 ; Rev.
Laws, 1833, p. 135, Secs. 15, 16.

By the act of 1833, Purple's Real Est. Stat., 489, Sec. 5, it
was provided that after the first of August of that year, " all
deeds and *other title papers,* which are required to be recorded,
shall take effect and be in force from and after the time of filing

the same for record, and not before, as to all *creditors* and subsequent purchasers without notice."

So stands the law now on this subject, digested into chapter 24, Rev. Stat. 1845, pp. 108 and 109, Secs. 22, 23, 24 and 28, embracing in Sec. 26, a power in the county commissioners to convey the real estate of the county, by executing "deeds, grants, conveyances and bonds," as a part of the provisions regulating "conveyances," and for recording the same. It is wholly inadmissible to exclude the contracts and conveyances of the county commissioners, from the operation of the recording acts, which would be the effect of holding the entry of their bargains upon their own records, as constructive notice. Hamilton should have procured and recorded a contract or deed, so as to give notice and prevent his title being destroyed by a subsequent sale or conveyance. The case of *Neilson, Nichols & Co.* v. *Churchill et al.*, 5 Dana R. 339, referred to in support of the doctrine of records being notice, does not militate with, but supports the principles laid down by us in reference to such judicial records as have become liens upon the land by levy, or of themselves.

The rule requiring a prudent and diligent inquiry by persons having such notice as should put a prudent man upon inquiry, and holding them to abide the consequences of the facts and circumstances which would have been reached by making it, as held in *Nants et al.* v. *McPherson*, 7 Monroe R. 599, and *Russell* v. *Petree, etc.*, 10 B. Monroe R. 186, is fully recognized, but it can have no application here, as there is no proof, or admission of notice, in the answers of the subsequent purchasers. The bare existence of these orders, on the books, is all that is shown. To give them *any* effect as notice, would be that of constructive, full notice. In the *County of La Salle* v. *Simmons*, 5 Gil. R. 516, the treasurer's memorandum book of receipts of public money, is not treated as a record, though it was admitted in evidence against the county, because kept under the view and direction of the commissioners. In case of refusal of a decree for conveyance, complainant asks the alternative relief, by decree for value of the land, or the price for which it was re-sold, or the price his vendor paid the county, and in either case, with interest. We think he is entitled to the price of the land received by the county, on the sale to Morton, with interest, from the respective days when paid to the county commissioners. As they have re-sold these lots, after having received payment for them of Hamilton, to innocent purchasers, without notice of Hamilton's equity, and thereby prevented him from recovering the land itself, they should be treated and held as trustees of the purchase money,

35

# 546 OTTAWA,

and be made to account for it, with interest. This would seem to us to be but just. The statute of limitations cannot avail as a defense. Although equity will adopt the time in analogy to the rule at law, yet an action of ejectment would not be barred, nor would a bill for specific performance between the original parties. Angell on Limit. 24 to 29. This may not be a direct trust, of the kind not falling within the statute of limitations ; but in disposing of such a defense, as applicable to the question of refunding the purchase money, or returning the price received for the land on re-sale, we may adopt the analogy to the bar of an ejectment, or bill for specific performance, as more appropriate and equitable than the action of debt for the money, which would shorten the period of defense. But if we date the cause of action from the day of conveyance, and not of sale, the bar is not complete to debt. Angell on Limitations, 508 to 515. The case of *Frailey* v. *Langford et al.*, 1 A. K. Marsh. R. 362, differs only in the fact, that here are innocent purchasers to prevent a decree for specific performance. The court there would not apply a limitation under twenty years, to a bill for specific performance. Such was the time for ejectment. *Stewart* v. *Jackson*, ibid. 27, 59, 106, 506 ; 2 ibid. 570.

The sum to be recovered in this case, is not to be likened to the damages recoverable for breach of covenant of title and seizin or breach of covenant against encumbrances, (for which see Sedgw. on Dam. 158 to 204,) for that might operate as an inducement, or bounty to parties to re-sell land in violation of their engagements, when by its rise, they could repay the purchase money, and retain a large balance.

We think, where there is no question about a want or failure of title in the vendor, nor of encumbrances, but a wanton or careless breach of contract by re-selling the same lands for an advance, that such vendors cannot complain that they are treated as trustees of the proceeds for the benefit of the first vendee, and compelled to account for them, with legal interest ; nor could they, if compelled to pay more interest, when shown to have been received by them for the use of the money. See *Powell et al.* v. *Jeffries et al.*, 4 Scam. R. 390.

Decree reversed, and cause remanded for decree in conformity with opinion of this court.

*Decree reversed.*