James E. POHRER, et al., Plaintiffs,

v.

TITLE INSURANCE COMPANY OF MINNESOTA, Defendant and Third Party Plaintiff,

v.

HARRIMAN MORTGAGE INVESTORS, INC., Third Party Defendant.

No. 85 C 8832.

United States District Court, N.D. Illinois, E.D.

Jan. 14, 1987.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs James E. Pohrer and Peter S. Brune, d/b/a Midwest Office Investors, a Missouri general partnership (Pohrer), purchased a parcel of land in Naperville, DuPage County, Illinois in 1983. Defendant Title Insurance Company of Minnesota (TICOM) issued a title commitment and insurance policy on the land which purported to inform Pohrer of the property's tax status. However, because of a special services area assessment, the 1983 real estate taxes on the property proved to be more than 100 times greater, and the 1984 taxes more than 200 times greater, than Pohrer had expected on the basis of the commitment and policy. Pohrer wants TICOM to pay the taxes. TICOM contends that the title policy does not cover them.

Pohrer has brought three counts against TICOM. Count I alleges that TICOM breached the insurance policy in refusing to pay the special service area taxes. Count II alleges that TICOM's refusal to pay is vexatious and unreasonable. Count III appears to allege negligent misrepresentation, or possibly professional malpractice, in TICOM's issuance of the title commitment. Both parties move for summary judgment on counts I and II; Pohrer alone moves for summary judgment on count III. Because the policy's terms are ambiguous as applied to this situation, this court grants partial summary judgment to Pohrer on count I on the issue of liability. TICOM is granted summary judgment on count II. There appears to be no reason to reach count III.

TICOM has impleaded Harriman Mortgage Investors, Inc. (Harriman), who sold

Pohrer the land, claiming that if it is found liable it should be subrogated to Pohrer's rights against Harriman for breach of the warranty deed which accompanied the property. Harriman has moved to dismiss TICOM's third party complaint on essentially the same grounds which TICOM uses as the basis for its summary judgment motion. It follows that Harriman's motion is also denied.

### FACTS

Before plaintiffs bought the land in Naperville, TICOM delivered a title commitment to them which showed no unusual tax liens on the land. Following the purchase, TICOM issued a title policy with exclusions identical to those on the commitment which insured Pohrer's title against defects, liens and encumbrances as of December 19, 1983, the policy date.

On July 16, 1979, the City of Naperville had established Special Service Area Number 3,[1] encompassing the property purchased by Pohrer. Funding for the special service area was to be provided by the issuance of tax bonds. The bonds were to be payable from an *ad valorem* tax levied on all taxable property within the special service area. On October 15, 1979, the City of Naperville passed a bond ordinance providing for the issuance of the tax bonds. The ordinance listed the taxes to be levied from 1979 to 1992 to be applied to retiring the principal and interest on the bonds. Pursuant to statute the bond ordinance was filed in the office of the County Clerk of DuPage County, Illinois. *See* Ill.Rev. Stat. ch. 120, ¶ 1310 (1985). The bond ordinance required that each year the city pass another ordinance levying taxes for that year. The ordinance creating the annual levy is also filed with the county clerk.

Pursuant to the annual levy, each year the county clerk assesses and extends taxes against each individual landowner in the special service area. The Illinois Revenue Code provides that these special service area taxes are a lien on the property from the first of the year in which the taxes were levied. *See* Ill.Rev.Stat. ch. 120, ¶ 697 (1985).

DuPage County's itemized bill for the 1982 real estate taxes on Pohrer's property showed special service area taxes in the amount of $154.85 as the major component in a total tax bill of $200.86. Schedule B of TICOM's title policy includes the following notations under "General Real Estate Taxes:" "Note: The amount of the 1982 taxes is $200.86 and is paid. Note: Taxes for the year 1983 are not yet due and payable." However, no later than September 20, 1983, and so prior to the effective date of TICOM's title policy, $24,408.13 in special service area taxes had been levied and assessed against Pohrer's property. In 1984, an additional $47,120.71 was levied and assessed against the property. Upon TICOM's refusal to pay the assessed taxes for 1983 and 1984 and all special service area taxes through 1992, Pohrer sued.

The title policy contained three coverage limitations which are relevant to this case. It excluded coverage for loss or damage caused by defects, liens and encumbrances attaching or created after the policy date; "general real estate taxes for 1983;" and taxes and special assessments not shown by the "public records." The title policy defined public records as "those records which by law impart constructive notice of matters relating to said land" (plaintiff's complaint, exh. A).

---

**1.** A special service area is a contiguous area within a city or county in which special governmental services are provided. The services to be provided are paid for by taxing real property within the special service area. Special services, despite the designation, can be any governmental services provided. Ill.Rev.Stat. ch. 120, ¶ 1302 (1985). The purpose behind the special service area is to allow municipalities to provide services and make improvements within limited areas and impose taxes only on those areas benefitted without creating additional taxing bodies. *Hiken Furniture Co. v. City of Belleville,* 53 Ill.App.3d 306, 11 Ill.Dec. 353, 356, 368 N.E.2d 961, 964 (5th Dist.1977). In the present case, the special service area tax was to provide for the construction of roads, sewers and water mains within Special Service Area 3. *See* Naperville, Ill. Ordinance 79–93 (July 16, 1979).

## DISCUSSION

TICOM's liability on count I turns on interpretation of the insurance contract. The parties' arguments take several twists and turns which can best be followed in the sequence they might take in a hypothetical dialogue. Pohrer assumes that in purchasing title insurance he purchased a search for existing defects, liens and encumbrances, including tax liens. If any defect, lien or encumbrance existed at the time but TICOM failed to make it known to him, he further assumes that the title insurance policy protects him against loss or damage following from the surprise. Thus Pohrer says, simply enough, that the special service area tax lien was in existence when he bought the land; TICOM did not bring it to his attention; that is precisely the kind of surprise he thought he was insured against, and he expects coverage of his losses.

TICOM responds in effect by telling Pohrer to read his policy. The policy expressly excludes coverage of loss or damage for taxes or special assessments not shown by the "public records." Pohrer counters that the tax was filed with the county clerk, and a filing with the county clerk is both a record and public. TICOM parries by pointing to the policy's definition of "public records:" not all public records, but only those records which under Illinois law impart constructive notice of matters relating to land. According to TICOM, the county clerk's records do not fall within that category.

Pohrer points out that under the statute which governs special service area assessments, a filing with the county clerk is all that is necessary to create a tax lien against the land. Ill.Rev.Stat. ch. 120, ¶ 1310. He therefore does not understand how that filing could fail to give a prospective purchaser constructive notice. TICOM, however, asserts that such an approach mischaracterizes the issue. The question is not whether Naperville did all that was necessary to obligate Pohrer to pay the tax assessment or else have a lien placed on his property. The question is rather what kind of losses TICOM promised to insure Pohrer against under the terms of the title insurance policy. The policy excludes any coverage of tax liens which do not appear as liens in those records which under Illinois law impart constructive notice of matters relating to land. Compliance with all the statutory steps for a creation of lien is not the same thing as effectively recording it. *Cf.* Ill. Rev.Stat. ch. 30, ¶ 127 (mechanics' liens, though created by operation of statute which requires no filing, must nevertheless be recorded with the recorder of deeds to be effective). TICOM's policy covered only tax liens which were recorded so as to give constructive notice, regardless of whether or not their creation complied with the statutory requirements for such liens.

If one accepts TICOM's characterization of the issue, then its construction of the terms of the policy is correct. In Illinois, books, papers and entries relating to land filed with the county clerk's office do not give constructive notice of their subject matter to subsequent purchasers. *See Lewis v. Barnhart,* 145 U.S. 56, 80, 12 S.Ct. 772, 779, 34 L.Ed. 621 (1892) (applying Illinois law); *Anthony v. Wheeler,* 130 Ill. 128, 137–138, 22 N.E. 494, 496 (1889); *Betser v. Rankin,* 77 Ill. 289, 293 (1875); *Bourland v. County of Peoria,* 16 Ill. 538, 542–43 (1855). For example, in *Betser,* information in records kept for tax purposes was not chargeable to subsequent *bona fide* purchasers of land. Similarly, in *Bourland,* recording a sale of land by county commissioners in their own records was not constructive notice of the sale. In order to impart constructive notice, the *Bourland* court held that the commissioners should also have filed with the Recorder of Deeds.

In general, constructive notice is given to liens on property only when they are recorded in the recorder's office or found in the judicial records of the county where the land is located. *Illinois National Bank v. Chegin,* 35 Ill.2d 375, 380, 220 N.E.2d 226, 229 (1966); *Eckland v. Jankowski,* 407 Ill. 263, 267, 95 N.E.2d 342, 344

(1950); *Hillblom v. Ivancsits*, 76 Ill.App.3d 306, 311, 395 N.E.2d 119, 122, 32 Ill.Dec. 172, 175 (1st Dist.1979). Requiring a more expansive search of governmental bodies for real estate records is an unreasonable burden on a purchaser. *Cf. Burlew v. City of Lake Forest*, 104 Ill.App.3d 800, 805, 433 N.E.2d 353, 356, 60 Ill.Dec. 556, 559 (2d Dist.1982) (unreasonable for purchasers who were on inquiry notice of encroachment on their property to search beyond recorder's office). The filing of the special service area tax ordinance in the county clerk's office did not place it within the records which impart constructive notice of matters relating to land under Illinois law. Thus TICOM's policy appears to be written to exclude coverage for the special service area tax lien.

However, TICOM itself did not accept such a characterization when it issued the policy. If the county clerk's records are not deemed "public records" under the policy, and tax liens are rarely of record anywhere else except the county clerk's office, then TICOM would have virtually no responsibility toward tax liens whatsoever. But elsewhere in the policy TICOM appears to have affirmatively promised to search for, report on, and if it failed to accurately report, insure against tax liens. The policy does not exclude all tax matters, but rather only those "not shown as existing liens by the public records." Moreover, schedule B, with its notations about 1982 and 1983 taxes, purports to include the results of a search for tax liens. The average reader of the policy would conclude that TICOM had searched the records where real estate tax liens appear, reported the results, and limited its liability only by excluding any liens which were not of record in the place where real estate tax liens appear.

A definition of "public records" which would include those records which contain matters relating to real estate tax liens seems more consistent with these portions of the policy. If we adopt the definition of "public records" which TICOM now urges, however, these portions of the policy become, to use the most charitable description which comes to mind, highly misleading. They appear to bring tax matters within the scope of the policy. But in fact, thanks to the policy definition of "public records" plus the narrow interpretation Illinois case law makes of which records give constructive notice of matters relating to land (which interpretation does not itself appear in the policy), tax matters would not be within the scope of the policy at all.

█ Moreover, an insurance contract is ordinarily construed in accordance with the intent of the parties to it and their ostensible purpose in making it. *Goetze v. Franklin Life Insurance Co.*, 26 Ill.App.3d 104, 108, 324 N.E.2d 437, 441 (2d Dist. 1975). The purpose of a title insurance policy is precisely what Pohrer assumes it is, to protect a purchaser of real estate against title surprises—ordinarily including tax liens. *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.*, 61 Ill.App.3d 911, 378 N.E.2d 355, 18 Ill.Dec. 891 (3d Dist. 1978) (inheritance tax lien). "When a person seeks title insurance, he expects to obtain a professional title search, legal opinion as to the condition of title, and a guarantee. Accordingly, the insurer has a duty to search the records and examine the applicable law before issuing its commitment or policy." 61 Ill.App.3d at 916, 378 N.E.2d at 359, 18 Ill.Dec. at 895 (citation omitted). From the information TICOM gave Pohrer, he expected annual real estate taxes of around $200. Instead, he found himself owing $24,408.13 in special service area taxes for 1983 alone. This court considers that difference in amount a significant title surprise. Moreover, TICOM does not dispute that the amount had been assessed, and was therefore discoverable in *a* public record, before the title policy was issued. If we construe the policy's definition of "public records" as TICOM suggests, TICOM is left with no obligation toward Pohrer regarding that lien, neither to inform him of it nor to insure against loss on account of it if it failed to inform him. Under such a construction the contract would fail in its essential purpose.

■ When portions of a title insurance policy conflict with each other, and the conflict can only be resolved by adopting a construction which would make one portion highly misleading and in addition would cause the policy to fail in its essential purpose, then the preferred course is to find the policy term ambiguous. *Dinges v. Lawyers Title Insurance Corp.*, 106 Ill. App.3d 188, 435 N.E.2d 944, 62 Ill.Dec. 146 (5th Dist.1982). In *Dinges*, the plaintiffs had purchased property through which a paved street ran. The report from the title insurer had indicated that the city merely leased the land for the street and that the lease was cancellable, which was true as far as it went. However, the land also was subject to an easement in favor of third parties. The easement was recorded, but did not appear in the title insurer's report. When plaintiffs discovered that they could not close the street, they sued the title insurer. The insurer contended that a policy term excluding "rights of others in and to that portion of the property within the bounds of any roads, streets or highways" applied to the easement—*i.e.*, to rights of record as well as rights not of record. 106 Ill.App.3d at 190, 435 N.E.2d at 946, 62 Ill.Dec. at 148. The court declined to adopt such a construction in light of the insurer's affirmative commitment elsewhere in the policy to search and report on rights of record. Instead, it found the term ambiguous as applied to a recorded easement. 106 Ill.App.3d at 191, 435 N.E.2d at 947, 62 Ill.Dec. at 149. Likewise, we decline to adopt the construction of "public records" which TICOM now urges in light of its affirmative commitment elsewhere in the policy to search for recorded tax liens. Instead, we find the policy's definition of "public records" ambiguous as applied to a special services area tax lien.

■ A similar ambiguity exists with regard to the clause excluding "general real estate taxes" for 1983. Neither the policy nor Illinois law defines "general real estate taxes." We recognize that the mere failure to define a term in an insurance policy does not as a matter of law render a policy exclusion ambiguous. *See Keyser v. Con-*

*necticut General Life Insurance Co.*, 617 F.Supp. 1406, 1410 (N.D.Ill.1985). However, the exclusion here does not clarify which if any real estate taxes levied against Pohrer's property, including the special service area taxes, constitute general real estate taxes. Thus it is not clear which taxes are excluded from coverage and which if any are covered. Again, the commitment and policy purported to offer information about real estate taxes for 1983, creating the same kind of conflict between an apparent affirmative promise in one clause and an exclusion in another that exists for the "public records" problem. This clause, too, is ambiguous.

■ When the terms of an insurance policy are ambiguous, a court in resolving the ambiguity should "consider the purpose sought to be accomplished, the subject matter of the contract and the circumstances surrounding the issuance of the policy." *Dinges*, 106 Ill.App.3d at 191, 435 N.E.2d at 947, 62 Ill.Dec. at 149. These considerations usually mean that a court construes the ambiguous term most strictly against the insurer and in favor of the insured, since the purpose of the contract is to indemnify the insured and the insurer chose the language for the contract. *Hartford Accident and Indemnity Co. v. Neff*, 594 F.Supp. 317, 320 (N.D.Ill.1984). These principles apply to title insurance policies.

Moreover, unlike some insurers, a title insurer has some duty to the insured even before the policy is issued. Typically a prospective purchaser of real estate intends to rely on the title insurer's search when he decides whether or not to purchase the property. Thus he expects the insurer to have researched the applicable law, as well as the records, before issuing the commitment and to provide him with warnings about areas in which he might find surprises—not to itself surprise him with the use of ambiguous clauses. *Dinges*, 106 Ill. App.3d at 191, 435 N.E.2d at 947, 62 Ill. Dec. at 149; *McLaughlin*, 61 Ill.App.3d at 916, 378 N.E.2d at 359, 18 Ill.Dec. at 895. In arriving at our construction of the poli-

cy, we must consider the purpose of warning a prospective purchaser as well as the purpose of indemnification.

█ We conclude that the exclusions TICOM asserts do not reach the special services area tax lien, and that TICOM is obligated to pay Pohrer's loss or damage stemming from the lien. It is impossible to conclude that TICOM had no duties whatsoever toward the lien. In issuing both the commitment and the policy, TICOM stated the amount of real estate taxes for 1982 and the fact that they were paid. Since TICOM could only have learned that information at the county clerk's office, a reasonable inference is that TICOM did at least some searching in the records of the county clerk's office. Thus TICOM itself apparently considered those records "public records" within the scope of the policy coverage. If it did not, it should have. It owed Pohrer a duty to inform him of recorded liens against the property, including tax liens, and tax liens could only be found there.

Moreover, TICOM obviously had actual knowledge that the property was in a special services area. TICOM listed the amount of 1982 taxes correctly at $200.86. It could have arrived at that total only by including $154.85 for the special services area tax, which was itemized on the tax bill. It had to know of the tax. Given that knowledge, it had the further duty to determine the nature and extent of the implications of special service area status at least for current, if not future, taxation. Had it done so even minimally, it would have found the $24,408.13 assessment for 1983, which was of record at least three months before the date of the policy. A report of only that existing lien amount would have warned Pohrer that the property's tax future stood to be vastly different than its tax past. From the purpose of title insurance generally and the specific statements in this policy about taxes, Pohrer had every reason to think that if such a tax surprise existed TICOM would have warned him about it. Records of special services area tax liens are only maintained in one place—

the county clerk's office. In light of the purposes and circumstances of this contract, the policy's clauses relating to taxes and public records must be construed to include those records within the public records which TICOM had a duty to search. The policy covers Pohrer's losses from the existence of the tax lien.

█ TICOM next argues that even if it is liable for the special service area taxes levied prior to the issuance of the title policy, it is not liable for taxes extended after December 19, 1983, the policy date. The basis of TICOM's argument is that the tax bond ordinance provides for an annual tax levy. The annual levy creates an annual lien. Thus, says TICOM, while it may be liable for 1983 taxes levied prior to issuing the policy, it is not liable for taxes levied after the policy date. Pohrer claims that the October 15, 1979 ordinance authorizing the tax bonds created an aggregate lien on his property for the period of 1979 through 1992. Thus, according to Pohrer, TICOM is liable under its title policy for his losses from all special service area taxes assessed against his property through 1992.

Pohrer prevails on this point. Illinois law requires that before incurring a debt a city must levy taxes to discharge the debt. A statute levying taxes to discharge a debt is self-executing and there is no requirement that a city levy taxes annually. *Central Illinois Public Service Co. v. Miller,* 42 Ill.2d 542, 545–546, 248 N.E.2d 89, 91 (1969); *People ex rel. Brenza v. Anderson,* 411 Ill. 252, 260, 103 N.E.2d 629, 634–35 (1952). A tax levy occurs only once, although taxes may be extended and collected over a number of years. The extension and collection of taxes is an administrative function not requiring legislative approval. *Royal Liquor Mart, Inc. v. City of Rockford,* 133 Ill.App.3d 868, 872–876, 479 N.E.2d 485, 489–91, 88 Ill.Dec. 872, 876–78 (2d Dist.1985). Thus the county clerk may assess and extend taxes even in the absence of an annual levy. *See Central Illinois Public Service Co.,* 42 Ill.2d at 546, 248 N.E.2d 89. In our case, the 1979 tax bond ordinance levied taxes through 1992.

Under Illinois law the tax levy becomes a lien at the time of the levy. Ill.Rev.Stat. ch. 120, ¶ 697 (1985). Thus the bond ordinance created an aggregate lien on Pohrer's property and TICOM is liable for all losses from these taxes through the life of the bond ordinance.

Even if this were not true, the losses are probably within the scope of Pohrer's damages from the failure to report the 1983 lien in any case. TICOM had a contractual duty to warn of the existing lien, easily could have, and did not. To the extent that Pohrer relied on TICOM's report showing no unusual taxes in deciding to purchase the property, while if he had known the taxes would increase more than a hundredfold he would not have purchased it, arguably TICOM's breach caused long-term as well as short-term losses from taxes. TICOM's motion for summary judgment on count I must be denied.

It does not necessarily follow, however, that Pohrer's motion for summary judgment on count I should be granted in its entirety. Pohrer wants TICOM to pay all special service area taxes on the land through 1992, up to the face amount of the policy, $924,000. However, as TICOM points out, in the policy it did not promise to pay the cost of curing any defect in, or of buying out any lien or encumbrance on, the title. Rather, it promised to pay "loss or damage ... sustained or incurred by the insured by reason of" such defect, lien or encumbrance, which is not precisely the same thing. Pohrer's losses may be the full amount of the taxes, but given appropriate facts they might be better characterized as the diminution in the sale price of the land because of the unexpected taxes. An affidavit which TICOM submits suggests that Pohrer has no damages at all, because it leased the property to a commercial tenant who agreed to pay all taxes, although possibly Pohrer has some exposure to the tenant in the circumstances.

Whatever the case, Pohrer, as the movant for summary judgment, had the burden of demonstrating the absence of dispute on factual issues. Pohrer submitted no hard evidence on the actual amount of damages, and TICOM disputes the claimed amount, so Pohrer has not met the movant's burden on the issue of damages. On count I, we grant partial summary judgment to Pohrer of the issue of liability. The question of damages remains open.

■ Although Pohrer wins on count I of his complaint, he loses on count II. In count II, Pohrer alleges that TICOM's refusal to pay under its title policy was vexatious and unreasonable. A vexatious and unreasonable refusal to pay an insurance claim allows an insured to recover attorneys' fees plus additional damages from an insurer. *See* Ill.Rev.Stat. ch. 73, ¶ 767. However, an insurer has a right to rely on express exclusions in its policy in denying coverage. Where the validity of the exclusionary clause is supported by case law, the refusal to pay is reasonable even if judgment eventually goes against the insurer. *See Herrera v. Benefit Trust Life Insurance Co.*, 126 Ill.App.3d 355, 466 N.E.2d 1172, 81 Ill.Dec. 370 (1st Dist.1984); *Cummings Foods, Inc. v. Great Central Insurance Co.*, 108 Ill.App.3d 250, 439 N.E.2d 37, 64 Ill.Dec. 108 (4th Dist.1982).

Here TICOM relied on clear expressions of Illinois case law that filing in a county clerk's office is not constructive notice in arguing it was not liable under its title policy. Further, the facts before us required resolution of ambiguities in contract language and Illinois property law. TICOM should not be penalized for choosing to litigate these issues. *See King v. Equitable Life Assurance Society*, 125 Ill. App.3d 542, 548, 466 N.E.2d 353, 357, 80 Ill.Dec. 901, 905 (3d Dist.1984).

■ In count III Pohrer has alleged what appears to be a claim for negligent misrepresentation. Pohrer has alleged that prior to receiving the title policy he received a title commitment from TICOM. The title commitment and title policy did not show the special service area taxes on the property. At the time of the purchase, Pohrer did not know that the special service area taxes were levied against the property. Pohrer relied on the title com-

mitment and title policy in making his decision to purchase the property. Pohrer, not having the expertise to conduct a title search, relied on TICOM's experience and expertise to determine if there were any liens on the property. If Pohrer had known of the special service area taxes, he claims, he would not have paid the purchase price for the property.

Pohrer's allegations can possibly be construed as a claim for negligent misrepresentation or even as a different contract claim. But Pohrer has submitted little or no evidence directed specifically at this count and has scarcely briefed the legal issues. It may well be that this count is entirely superfluous, given the ruling on count I. In any event, summary judgment is highly premature. Pohrer's motion for summary judgment on count III must be denied.

### CONCLUSION

Plaintiffs' motion for summary judgment is granted, as to defendant's liability on count I only; it is denied as to damages on count I and denied in all other respects. Defendant's motion for summary judgment is denied as to count I but granted as to count II. Third party defendant's motion to dismiss the complaint against it is denied.