RESOLUTION TRUST CORPORATION, as Conservator for GreatAmerican Federal Savings and Loan Association, Plaintiff,

v.

AETNA CASUALTY & SURETY COMPANY OF ILLINOIS, Defendant.

No. 90 C 1939.

United States District Court, N.D. Illinois, E.D.

Aug. 20, 1993.

611

Ray G. Rezner, Wendi Sloane Weitman, William Scott Porterfield, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for plaintiff.

Mark L. Karasik, Donald J. Hayden, Thomas Anthony Doyle, Donna Jordan Williams, Baker & McKenzie, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Resolution Trust Corporation ("RTC"), as conservator for GreatAmerican Federal Savings and Loan Association ("GreatAmerican"), filed suit against Aetna Casualty & Surety Company of Illinois ("Aetna") after Aetna denied coverage for claimed losses sustained by GreatAmerican. RTC argues that the losses are covered by two alternative insuring agreements contained in the standard savings and loan bond agreement in effect at the time GreatAmerican suffered its losses. Both RTC and Aetna have moved for summary judgment. In addition, RTC has filed a motion to strike the affidavit of Aetna's expert, Dr. Marcia Stigum. In response, Aetna has moved to strike the affidavit of RTC's expert, Dr. Robert E. Whaley. For the following reasons, RTC's motion for summary judgment is denied and Aetna's motion for summary judgment is granted. Further, both RTC and Aetna's motions to strike the expert affidavits are denied.

## BACKGROUND

The undisputed facts stipulated to by RTC and Aetna are as follows. In 1985 GreatAmerican was a federal mutual savings and loan institution with its principal office located in Oak Park, Illinois. Defendant Aetna is an insurance company organized and existing under the laws of Illinois. On or about November 9, 1983, Aetna issued its Savings and Loan Blanket Bond No. 08 F 11292 BCI (a Standard Form No. 22) (the "Bond") to GreatAmerican.[1] The Bond was in effect beginning January 15, 1984 and continuing until after June 30, 1985. The Bond had a limit of liability of $3,000,000 and a deductible of $25,000.

Under the Bond, Aetna agreed to indemnify GreatAmerican up to the limits of liability, subject to the declarations, general agreements, conditions and limitations and other terms thereof for losses covered by the Bond's Insuring Agreements. Under the relevant portions of Insuring Agreement B, Aetna agreed to indemnify GreatAmerican for:

> (B)(1) Loss of Property resulting directly from
>
> (a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof while the Property is lodged or deposited within offices or premises located anywhere, or
>
> (b) theft, false pretenses, common law or statutory larceny committed by a person
>
> (i) present in an office or, on the premises of, the Insured, or
>
> (ii) present on the premises in which the Property is lodged or deposited....

Coverage under Insuring Agreement B is subject to a number of exclusions. Section 2(e) of the Bond excludes coverage for:

> loss resulting directly or indirectly from complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D) or (E).

Section 2(i) of the Bond excludes coverage for:

> loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured or any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreements (D) or (E).

The exclusions in sections 2(e) and 2(i) apply to claims under Insuring Agreement (B);

---

1. The blanket bond in question is an indemnity insurance contract that combines five separate "Insuring Agreements," each of which covers a different financial risk associated with banking. The blanket bond is standard throughout the banking industry.

they do not apply to claims under Insuring Agreement (E).

Under the relevant portions of Insuring Agreement E, Aetna agreed to indemnify GreatAmerican for:

> (E) Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original
>
> > (a) Security,
>
> .   .   .   .   .
>
> which
>
> > (iii) is lost or stolen;
>
> .   .   .   .   . .

Actual physical possession of the items listed in (a) through (g) above by the Insured, its correspondent institution or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such items.

GreatAmerican began trading with Bevill, Bresler & Schulman, Inc. ("BBS") in 1981 and continued to trade with BBS until BBS filed for bankruptcy in 1985. In 1982, GreatAmerican began transacting repurchase ("repo") and reverse repurchase ("reverse repo") agreements through BBS.[2] The typical repo is a two-part transaction.[3] The first part consists of the agreement to transfer a specified security by one party to another party in exchange for a fixed price. The second part consists of the contemporaneous agreement by the seller to return or "repurchase" the security on a specified future date

at the original price plus an agreed upon rate of return.

The typical reverse repo consists of the same two-part transaction viewed from the perspective of the other side of the transaction. (For purposes of this opinion, the terms "repo" and "reverse repo" will be used to describe transactions from the perspective of the dealers, AMC or BBS. Thus, in a repo transaction, AMC or BBS "repoed out" or transferred a security to a repo participant, the buyer, and simultaneously agreed to repurchase the security on a future date. Conversely, in a reverse repo transaction, AMC or BBS, as buyer, "reversed in" or purchased a security from a reverse repo participant, who agreed to repurchase the security on a future date.)

Once a repo or reverse repo transaction is entered into, the parties generally have three choices regarding custody of the underlying security: a repo transaction may be (a) a possessory, delivery repo transaction; (b) a non-possessory repo transaction; or (c) a tripartite repo. In a delivery repo transaction, the dealer actually transfers the security to the repo participant at the outset of the transaction. Certificated securities are physically delivered in exchange for cash. In a non-possessory repo transaction, the dealer retains possession of the securities in an account with its clearing agent. In a tripartite repo, the securities are delivered to a third party, usually a custodial bank that contracts to hold the securities for the benefit of both parties.

Dealers frequently do not themselves physically retain the securities that they are holding. Many dealers instead utilize the services of clearing agents. A clearing agent

---

2. BBS was a securities broker-dealer that was registered with the Securities and Exchange Commission ("SEC") and a member of both the Securities Investor Protection Corporation ("SIPC") and the National Association of Securities Dealers, Inc. ("NASD"). Bevill, Bresler & Schulman Asset Management Corporation ("AMC") was a New Jersey corporation that is now defunct. AMC was an affiliate of BBS. AMC was not registered with the SEC or a member of the NASD. GreatAmerican's principal contact at BBS was John Zeimetz, a BBS vice president.

3. Although the parties, for purposes of the stipulated facts, have agreed to describe repo and reverse repo transactions and the parties engaged therein using words such as "purchase," "sale," "buyer," and "seller," the parties do not thereby agree on whether repo and reverse repo transactions are or should be characterized substantively as purchases and sales, loans, or any other types of transactions. In their respective memoranda of law, RTC argues that repos and reverse repos are purchases and sales of securities and Aetna argues that repos and reverse repos are transactions in the nature of a loan.

may perform a number of different services for its customers, including the receipt and delivery of securities, payment for securities, and collection or transfer of funds for securities sold. A clearing agent also often provides financing to a customer in the form of a line of credit (a "clearing loan") generally collateralized by those securities owned by the customer which are deposited at the clearing agent.

The dealer's transactions with its clearing agent are accomplished through two general types of accounts maintained by the clearing agent for its customer: (a) the clearing account; and (b) the safekeeping account. A clearing account is a general account used for deposits of cash and of securities owned by or otherwise available to the dealer for resale or for securing a loan from the clearing agent. A safekeeping account, on the other hand, is usually used to segregate those securities which are owned or fully paid for by the dealer's own customers and not generally available for serving as collateral to secure the loans from the clearing agent.

In February 1985, BBS maintained clearing and safekeeping accounts at Bradford Securities Processing Services ("Bradford"), a clearing agent with its principal office in New York. In March 1985, AMC also maintained clearing and safekeeping accounts at Bradford. In October 1984, BBS and AMC maintained clearing and safekeeping accounts at Security Pacific Clearing and Services Corp. ("Security Pacific"), a clearing agent with its home office in New York. In February and March 1985, respectively, BBS and AMC transferred their clearing and safekeeping accounts from Bradford to Security Pacific. At the time of the AMC and BBS bankruptcies in April and May 1985, respectively, Security Pacific was the clearing agent for both BBS and AMC.

On January 8, 1985, Mr. John Zeimetz of BBS telephoned GreatAmerican and offered a transaction in which (a) GreatAmerican would enter into a reverse repo agreement whereby GreatAmerican would sell certain Federal Home Loan Mortgage Corporation certificates, which it owned, to BBS for 5% less than the market price of those securities; (b) GreatAmerican would use the sale pro-

ceeds of the reverse repo agreement to enter into a matching repo agreement—GreatAmerican would buy various U.S. Treasury and federal agency and guaranteed mortgage backed securities from BBS; (c) the term of the matched reverse repo/repo transactions would be approximately six months; and (d) GreatAmerican would receive a net profit of 37.5 basis points—or a rate of return of 3.75%—on the matched reverse repo/repo transaction.

GreatAmerican agreed to the proposed reverse repo/repo transaction. On or about January 8, 1985, GreatAmerican sold two FHLMC participation certificates to AMC as the opening transaction of the reverse repo. The market price, less 5%, of the first certificate was $19.2 million. The market price, less 5%, of the second certificate was $15.2 million. GreatAmerican thus agreed to sell these two securities, then worth $34.4 million, to AMC and repurchase the securities in six months.

Simultaneously, GreatAmerican agreed to use the $34.4 million proceeds of the reverse repo to purchase $34.4 million of securities from AMC to be repurchased in six months. GreatAmerican agreed to sell the underlying securities back to AMC for $34.4 million, plus a rate of return of ⅜ths and ½ of 1%, respectively. Pursuant to this matched reverse repo/repo transaction, GreatAmerican's correspondent bank in New York delivered the two FHLMC certificates to Bradford, AMC's clearing agent. Those certificates are "securities", as that term is defined in the Bond. GreatAmerican understood that the two certificates or securities of like value would be sold back to it by AMC as the second part of the reverse repo transaction on June 28, 1985. AMC issued confirmation statements to GreatAmerican confirming the repos.

On September 7, 1984, GreatAmerican entered into a daily repo agreement with BBS in the amount of $5 million. A daily repo agreement is one that has a maturity date one business day after the settlement date. For example, the September 7, 1984 daily repo agreement would have a maturity date of September 8, 1984. However, it is common that a party may "roll over" a daily repo agreement and continue to extend it on a

daily basis. Under this daily repo transaction entered into on September 7, 1984, BBS/AMC transferred securities to GreatAmerican for $5 million and agreed to repurchase the securities back from GreatAmerican the next business day for $5 million plus an incremental amount. Rather than accept delivery of the securities sold to it by BBS/AMC, GreatAmerican agreed to allow BBS/AMC to hold the securities. GreatAmerican extended or "rolled over" the September 7, 1984 daily repo agreement through the date BBS/AMC filed for bankruptcy protection. At the time of the BBS/AMC insolvency proceedings, GreatAmerican's daily repo agreement was open. The securities underlying the daily repo transactions were "securities" as that term is defined in the Bond.

On April 7, 1985, AMC filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* On application of the SEC, AMC's Chapter 11 case was withdrawn from the Bankruptcy Court to the District Court of New Jersey pursuant to 28 U.S.C. § 157(d) because the case involved questions of both bankruptcy and securities law. On April 8, 1985, the SEC filed a complaint in the District Court against BBS, AMC, the five principals of BBS and AMC, and other related corporations and partnerships owned or controlled directly or indirectly by the principals. This complaint alleged, among other things, securities fraud in violation of the Securities Act of 1933 and the Securities and Exchange Act of 1934. On May 2, 1985, an involuntary petition in bankruptcy was filed against BBC by certain of its creditors. Shortly thereafter, on May 6, 1985, upon the application of SIPC, this bankruptcy case was converted to a liquidation under the Securities Investor Protection Act ("SIPA"). Trustees were appointed both in AMC's Chapter 11 case and in BBC's SIPA liquidation. The primary goals of such trustees were to discover and liquidate the respective assets of AMC and BBC, determine the amount and priority of claims against AMC and BBC, and ultimately apply the proceeds from liquidation to pay valid claims.

Underlying securities involved in the repo/reverse repo transaction were used by AMC to collateralize other repo transactions by AMC with customers other than GreatAmerican prior to AMC's bankruptcy. Similarly, the securities sold to GreatAmerican under the $5 million daily repo, and which were to have been held by AMC, were removed by AMC from its account at Bradford and used to collateralize other repo transactions. When AMC filed for bankruptcy, it was not holding the two FHLMC certificates for GreatAmerican's benefit in its accounts at Bradford or Security Pacific. Similarly, AMC was not holding the securities sold to GreatAmerican under the daily repo in its accounts at Bradford or Security Pacific on the date of bankruptcy. Since AMC was not holding any securities for GreatAmerican in AMC's safekeeping accounts at the time of its bankruptcy, and since all securities held in its clearing accounts were treated as general assets of AMC, GreatAmerican never received the two FHLMC certificates [FHLMC 18–946 and FHLMC 18–952] from BBC or AMC. Similarly, GreatAmerican never received the securities underlying the daily repo.

GreatAmerican first discovered that it may suffer a loss with BBC and AMC in late April 1985. GreatAmerican, with Aetna's knowledge, filed a proof of claim in the AMC and BBC bankruptcy proceedings, actively asserted its claims, and otherwise participated in AMC's Chapter 11 case and BBC's SIPA liquidation to recover its losses. GreatAmerican submitted a proof of claim in the BBC/AMC bankruptcies for $51,691,854. After the distributions by the AMC and BBC Bankruptcy Trustees, GreatAmerican's net losses in trading with BBC and AMC exceed the $3 million limit of liability and the $25,000 deductible under the Bond.

After GreatAmerican learned of AMC's bankruptcy filing on April 7, 1985, it immediately initiated communication to BBC/AMC to determine the impact of the bankruptcy on its securities and money. GreatAmerican learned for the first time in late April 1985 that BBC/AMC did not maintain the securities in a safekeeping account and that GreatAmerican may suffer losses as a result of the bankruptcy filings. On May 8, 1985, GreatAmerican gave Aetna oral and written

notice of loss, pursuant to Section 5 of the Bond. Section 5 of the Bond provides that the Insured must give notice under the Bond within 30 days of discovery of the loss. A copy of the written notice of loss is attached hereto as Exhibit 3.

On or about October 2, 1985, GreatAmerican provided Aetna with a written proof of loss in connection with the above detailed losses. Section 5 of the Bond requires that a proof of loss be submitted within six months after discovery of the loss. By letter dated July 15, 1986, Aetna denied coverage for the losses.

GreatAmerican filed suit against Aetna to recover under the Bond on April 6, 1987, in the Circuit Court of Cook County (No. 87 L 7822). On February 16, 1990, GreatAmerican failed and was placed in conservatorship of the Resolution Trust Corporation. By operation of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the RTC succeeds to all the rights and powers of GreatAmerican. The RTC, as conservator of GreatAmerican, substituted as the proper party plaintiff in this case on March 29, 1990. The RTC removed the state court proceeding to this court in April, 1990.

## DISCUSSION

### 1. Motions To Strike Expert Affidavits

Before us is RTC's motion to strike the affidavit of Dr. Stigum on the grounds that the affidavit is based, almost entirely, on inadmissible speculation, hearsay and conclusions. Also before the court is Aetna's motion to strike the affidavit of Dr. Whaley on the grounds that his opinion does not rise to the level of expert testimony within the meaning of the Federal Rules of Evidence ("Rule") 702.

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Clearly, the purpose of expert testimony is to assist the trier of fact to understand, evaluate, and decide complex evidential material.

As the trier of fact for purposes of these cross-motions for summary judgment, this court concludes that the issue of whether or not a repo transaction is a loan or a sale and purchase of a security is not so complex that this court needs the aid of expert testimony. Further, even if the court were to rely on the expert affidavits presented in this case, it is for the court, not the parties, to determine what portions of the affidavits are admissible and what portions should be stricken. It is also for the court to determine what weight to give to an expert's testimony.

For these reasons, RTC's motion to strike the expert affidavit of Dr. Stigum is denied and Aetna's motion to strike the expert affidavit of Dr. Whaley is denied. We have relied on our own understanding of the repo market and our own opinion of the nature of the transactions at issue in this case in reaching our conclusion.

### 2. Cross–Motions for Summary Judgment

Summary judgment is appropriate if "the pleadings, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(b). In ruling on a motion for summary judgment, a court must view the record and all inferences to be drawn from it in the light most favorable to the non-movant. *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991). A court should issue a partial summary judgment on those matters which there is "no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

No general issues of material facts exist in this dispute. Aetna concedes that it issued the Bond to GreatAmerican, that GreatAmerican suffered losses trading with BBS and AMC, that the Bond was in effect at the time of the losses and that GreatAmerican's losses exceeding the deductible and limitation of liability of the Bond. The only question is whether the losses incurred by GreatAmeri-

can trading with BBS and AMC are covered by the Bond.

■ Coverage under an insurance contract is a matter of contract law interpretation for the court. *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir.1987). Such contract law interpretation is a perfect vehicle for summary judgment. *Malcak v. Westchester Park Dist.*, 754 F.2d 239, 243 (7th Cir.1985).

■ When construing the Bond, two basic principles of law should be applied. First, the Bond, like all insurance policies, is a contract to be interpreted in accordance with the parties' intent, as evidenced by the plain and clear meaning of the language used. *Pohrer v. Title Ins. Co. of Minnesota*, 652 F.Supp. 348, 352 (N.D.Ill.1987). Second, if the insurance policy language is ambiguous, the insurance contract should be construed liberally in favor of the insured and strictly against the insurer. *Id.* at 353. This principle is most strictly applied when considering the meaning of exclusions and other attempts to limit liability. Exclusion from coverage or denial of liability is justified only where the terms are clear, explicit, and not subject to reasonable debate. *See, e.g., Goldblatt Bros. v. Home Indem.*, 773 F.2d 121, 125 (7th Cir.1985). If the terms of the Bond are unambiguous, the policy will be applied according to the terms of the contract. With these rules of construction in mind, we turn to the terms of the Bond.

### 1. *Insuring Agreement E*

■ Insuring Agreement E indemnifies GreatAmerican for "loss resulting directly from having ... in good faith and in the usual course of business ... act[ed] upon any security which is lost or stolen." Further, the coverage provides that: "actual physical possession of such security ... by the Insured, its correspondent financial institution or other authorized representative is a condition precedent to the Insured having relied

on ... such security." RTC argues that Insuring Agreement E applies in this case because GreatAmerican acted in good faith on securities that ultimately were stolen through the fraudulent practices of BBS and AMC. We disagree.

Looking at Insuring Agreement E in the context of the Bond as a whole, we conclude that Insuring Agreement E was not intended to cover all losses due to theft regardless of whether the theft occurred before, during or after the inception of the transaction. Instead, we interpret Insurance Coverage E as only covering defects in title arising prior to GreatAmerican's good faith reliance on an instrument or security. To interpret the clause any other way simply would not make grammatical sense since the loss would no longer stem from GreatAmerican's act of reliance on the security. Further, if we were to interpret the language of Insuring Agreement E to cover losses resulting from subsequent theft and acts of dishonesty, there would be no purpose for Insuring Agreement B which covers those losses subject to various exclusions.

Our interpretation of Insuring Agreement is supported by the court's holding in *Exeter Banking Co. v. New Hampshire Ins. Co.*, 121 N.H. 1083, 438 A.2d 310 (1981).[4] In *Exeter*, the court interpreted a similar bond provision to exclude losses under the bond resulting from subsequent theft of securities that an institution took and upon which it acted in reliance. The court concluded:

> In order to obtain coverage ... the insured's actions must concern instruments "which prove to have been ... stolen." By using the past tense of the verb steal, the policy requires that the "stealing" occurred prior to the insured's actions.

Similarly, the losses incurred by GreatAmerican did not result from a defect in title. They occurred as a result of subsequent theft and fraud on the part of BBS.[5] Therefore,

4. The Bond in question in *Exeter* provided:
   Loss ... through the Insured's (sic) having, in good faith and in the course of business, ... purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted

upon, any securities, ... which prove to have been lost or stolen.
438 A.2d at 312.

5. RTC argues that the language of the Aetna bond is slightly different from the clause in question in *Exeter* and, therefore, that the court's

RTC has failed to show that GreatAmerican relied on any security in its possession that is stolen within the meaning of Insuring Agreement E.

■ Even if we were to conclude that the loss suffered by GreatAmerican fell within the coverage extended under Insuring Agreement E, RTC has failed to establish that GreatAmerican, its corresponding institution or other authorized representative had "actual possession" of the securities at the time of the loss. Actual possession is a condition precedent to coverage under Insuring Agreement E.

It is undisputed that GreatAmerican never took physical delivery of the securities that it supposedly relied upon when entering into the repo portions of the transactions at issue. Instead, BBS or its clearing agents, Bradford and Security Pacific, maintained control over the securities throughout the tenure of the repo and reverse repo in question. However, RTC argues that even though GreatAmerican never took actual physical delivery of the securities it relied upon for the repo transactions, it had "actual possession" of the securities because BBS or its registered agents were acting as GreatAmerican's agent or registered representative for purposes of holding the securities.[6] We disagree.

There is simply no evidence that BBS or its clearing agents, Bradford or Security Pacific, were acting as GreatAmerican's agent either before, during or after the terms of the repo and reverse repo were negotiated. Instead, the evidence shows that GreatAmerican and BBS were engaged in arms length negotiations for each party's benefit. The confirmation slips indicate that BBS was acting as a principal for its own account in its transactions with GreatAmerican. In fact, the confirmation slips refer to GreatAmerican as "contra party." Thus, it is clear that

BBS and GreatAmerican's relationship was one of principal/principal and not one of principal/agent.

■ Further, there is simply no evidence that Bradford and/or Security Pacific were acting as GreatAmerican's corresponding institution or authorized representative. "A corresponding bank is one which regularly performs services for another in a place or market to which the other does not have direct access." *Securities Fund v. Am. Nat'l. Bank & Trust Co.*, 542 F.Supp. 323 (N.D.Ill.1982). Bradford and Security Pacific were clearly not acting in this manner for GreatAmerican.

Further, the term "authorized representative" connotes an "agency requirement" which did not exist between GreatAmerican and BBS' clearing agents. *See National City Bank v. St. Paul Fire and Marine Inc. Co.*, 447 N.W.2d 171, 176 (Minn.1989). As clearing agents for BBS, Bradford and Security Pacific were not acting as custodial banks for GreatAmerican. Neither took directions from or had any direct communication with GreatAmerican concerning the underlying securities to the repo transactions and GreatAmerican never received any separate statements of account concerning these securities.

In fact, the record shows that Bradford and Security Pacific only took instruction from BBS and that BBS had unrestricted access to the securities being held in accounts at Bradford and Security Pacific. More importantly, even if the securities were held in a safekeeping account, the securities were not held or segregated in the BBS accounts by reference to third parties like GreatAmerican. All instructions as to whether securities should be held in safekeeping or clearing accounts came from BBS and BBS could remove the securities from

---

reasoning in *Exeter* does not apply to the facts of this case. However, in *Hamilton Bank v. Insurance Co. of North America*, 384 Pa.Super. 11, 557 A.2d 747, 750 (1989), the court interpreted the exact language present in the Aetna bond as limiting coverage to losses resulting from securities that were lost or stolen at the time of the insured's taking and reliance.

6. RTC also contends that GreatAmerican or its registered agent had actual possession of the security prior to turning those securities over to BBS according to the terms of the repo and reverse repo agreements. Thus, RTC argues that it had "actual possession" of the securities. Since we interpret Insuring Agreement E as requiring the savings and loan to have actual possession at the time of the loss, we conclude that this argument has no merit.

either account at any time.[7] As the bankruptcy court noted, "the only party to have actual physical possession of the security in the AMC test cases was Security Pacific, and at no time was it acting as a designee of any of the repo participants." *In re Bevill, Bresler & Schulman Asset Management Corp.,* 67 B.R. 557, 604 (B.R. D.N.J.1986).

For the reasons stated above, Insuring Agreement E does not cover the losses suffered by GreatAmerican at the hands of BBS and AMC. GreatAmerican chose not to take delivery of the securities but, instead, to leave them in the custody of BBS. RTC must live with the consequences of this choice.

### 2. *Insuring Agreement B*

RTC next argues that GreatAmerican's losses fall squarely within the coverage provided by Insuring Agreement B. Insuring Agreement B provides coverage for loss of property resulting from misplacement or disappearance while that property is lodged or deposited within the premises and for losses resulting from theft or fraud committed by a person present on the premises in which the property is lodged or deposited. However, coverage under Insuring Agreement B is subject to various exclusions. In this case, Aetna argues that coverage for the claimed losses is excluded under both exclusion (e) and (i) of the Bond. Since we conclude that GreatAmerican's losses are excluded under "loan loss" exclusion (e), we will not address the parties arguments concerning "trade loss" exclusion (i).

**7.** In fact, the clearing custody and finance agreement entered into by BBS and Security Pacific specifically indicated that Security Pacific need not take any steps necessary to preserve the rights against prior parties unless instructed by BBS. Moreover, the agreement indicated the broad rights Security Pacific had over the collateral in its possession and control, including the right to grant a security interest and hypothecate, re-hypothecate, enter into and perform repo and reverse repo agreements and security loans with the collateral.

**8.** We agree with Aetna that regardless of the amount of the loss or the size and scope of BBS's fraud, the ultimate loss resulted from the failure of BBS and AMC to perform under the repo and reverse repo contracts. Thus, if the repo and

■ Exclusion (e) of Insuring Agreement B excludes all losses "resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any loan or transaction in the nature of a loan or extension of credit."[8] First, we conclude that exclusion (e) is unambiguous. *See Liberty Savings Bank v. American Casualty Co.,* 754 F.Supp. 559, 561 (1990). Therefore, we will apply the exclusion according to its terms. *See Continental Corporation v. Aetna Casualty & Surety Co.,* 892 F.2d 540, 544 (7th Cir.1989). Second, this court has found that loan loss exclusions like exclusion (e) are valid affirmative defenses to coverage under a bond. *See Lincoln–Way Federal Savings Bank v. Employers Insurance of Wausau,* 717 F.Supp. 617, 620 (N.D.Ill.1989). Therefore, the only issue before the court is whether the loss sustained by GreatAmerican fits under the terms of the exclusion clause.

■ With regards to this issue, RTC argues that the repo and reverse repo transactions in question were purchases and sales of securities and, therefore, outside the scope of exclusion (e). Aetna, on the other hand, argues that these transactions, although not outright loans, were either "de facto" loans or "transactions in the nature of the loan or extension of credit." Thus, Aetna argues coverage for the losses sustained by GreatAmerican is barred under exclusion (e).

Given the hybrid nature of repo transactions, it is not surprising that RTC and Aetna have such differing opinions as to the proper characterization of a repo and reverse repo.[9] There is simply no question that repo

reverse repo are considered either "loans or transactions in the nature of a loan or extension of credit" then it can be properly said that BBS defaulted for purposes of exclusion (e).

**9.** Most courts and commentators would agree that a repo is not a collateralized loan or a security but, instead, a hybrid of the two. In *After the Trade,* Dr. Stigum, Aetna's expert, wrote:

repos have certain of the characteristics of a collateralized loan and certain of the characteristics of a securities transaction. They are in truth a sort of legal jackass: part horse (securities transaction) and part donkey (collateralized loan).

Dr. Marcia L. Stigum *After The Trade* (1988), at 215.

and reverse repo transactions have functional attributes which resemble short-term collateralized loans. As one court stated:

> From a purely economic perspective, ... a repo is essentially a short-term collateralized loan, and the parties to these transactions tend to perceive them as such. The element of the transaction over which the most bargaining usually occurs is in the interest rate. The parties customarily refer to the underlying securities as "collateral," and the risk of a change in the value of the collateral remains with the borrow-·er, even though the lender "owns" it for the term of the agreement.

*S.E.C. v. Miller,* 495 F.Supp. 465, 467 (S.D.N.Y.1980). However, repos also possess many of the benefits of an outright sale and purchase of a security. *See In the Matter of Bevill, Bresler and Schulman Asset Management Corporation v. Army Moral Support Fund,* 67 B.R. 557 (D.N.J.1986).

■ When determining whether a particular repo transaction should be treated as a loan or a sale and purchase of security must be made on a case by case basis. *First Federal Savings & Loan Assoc. of Toledo v. Fidelity & Deposit Co. of Maryland,* 895 F.2d 254, 260 (6th Cir.1990). In *First Toledo,* the court laid out the factors that should be considered in determining whether a particular repo transaction should be considered a loan. These factors include:

> (1) whether the seller could require the purchaser to resell;
>
> (2) whether the purchaser could require the seller to repurchase;
>
> (3) whether a definite remedy was provided in the event of either party's default;
>
> (4) whether the seller agreed to pay interest at a stipulated rate;
>
> (5) whether the value of the securities equalled the amount advances;
>
> (6) whether there was evidence of a debt; and
>
> (7) whether any collateral was pledged.

*Id.* at 260 (citing *Citizens National Bank v. United States,* 551 F.2d 832, 838, 841, 213 Ct.Cl. 236 (1977)). After weighing these factors and carefully examining the transactions in question, the history and development of the repo market, the nature of the savings and loan industry and the intent of the parties who entered into these two transactions, we conclude that the repos and reverse repos at issue in this case are best characterized as "transactions in the nature of a loan" for purposes of the Bond. Thus, exclusion (e) bars recovery of the losses sustained by GreatAmerican.

First, the agreements entered into between GreatAmerican and BBS set forth specific maturity dates, settlement dates for repayment of funds and specific rates of interest to be paid at the time of settlement. Second, the interest rates were negotiated at a rate which had no relationship to the interest rate of the underlying securities. Third, on the front end, the securities were not sold for full market value as in standard purchases or sales. Instead, the funds disbursed were less than the market value of the collateral securities. Fourth, like a loan, principal and interest payments on securities underlying these transactions were to be paid to the original owner of the security during the term of the transactions. Moreover, GreatAmerican could enforce the agreement and require BBS to either repay the funds that were lent or to deliver the underlying securities at the end of the term of the agreement. Finally, the written agreement between the parties provided that in the event of a default, GreatAmerican was able to sell the underlying securities without notice and for the best price available, charging the loss, if any, to the account of BBS. Clearly, under the factors set forth in *First Toledo,* the repos and reverse repos appear to be, at the very least, "transactions in the nature of a loan."

More telling is the fact that the officers of GreatAmerican who were involved in the repo transactions in question considered the repos and reverse repos involved in this case to be lending and borrowing transactions even though the language of the agreements speaks in terms of the sale and purchase of securities. Ralph Bellon, Chief Financial Officer and Vice President of GreatAmerican, described repo transactions as the "lending of money on short term basis for which in turn the customer is given government securities, agencies or mortgage-backed securi-

ties as collateral." Bellon further described reverse repos as transactions "whereby their institution initiating that (sic) would be borrowing funds from the other institution." On its books and records, Bellon confirmed that GreatAmerican considered repo and reverse repo transactions to be the lending and borrowing of funds respectively and accounted for them differently than the purchase and sale of securities.

With regards to the January 8, 1985 transaction, Bellon described it as one where GreatAmerican "borrowed funds from BBS, collateralized by Federal Home Loan Bank mortgage obligations." As for the daily or open term repo of September, 1984, Bellon understood the transaction to be a "lending of funds" and that "certain securities were to collateralize for the benefit of GreatAmerican." GreatAmerican even recorded the transactions on its books as "credit transactions" and the underlying securities as "collateral" securing the transactions.

Thus, even if the repo and reverse repo transactions at issue in this case cannot be properly characterized as outright loans, they certainly can be characterized as transactions in the nature of a loan or extension of credit. Exclusion (e) shifts the risk to the insured for losses resulting from the default of any loan or transaction that functions as a loan. The language of the exclusion is broad. We cannot and will not rewrite the terms of the Bond. Thus, for purposes of the Bond, we conclude that the instant repos and reverse repos fall within the context of "transactions in the nature of a loan or extension of credit" and, therefore, coverage for the claimed loss is barred by exclusion (e).

### CONCLUSION

For the reasons stated above, Aetna's motion for summary judgment is granted. RTC's motion for summary judgment is denied. Aetna's motion to strike the affidavit of RTC's expert, Dr. Robert E. Whaley, is denied and RTC's motion to strike the affidavit of Aetna's expert, Dr. Marcia Stigum, is also denied.